**Katherine AMEN et al., Plaintiffs,**

v.

**CITY OF DEARBORN, a municipal corporation, et al., Defendants.**

**Civ. A. No. 37242.**

United States District Court,
E. D. Michigan, S. D.

Aug. 14, 1973.

Michael J. Barnhart, Center for Urban Law & Housing, Abdeen M. Jabara, Detroit, Mich., for plaintiffs.

Joseph Burtell, Legal Dept., City of Dearborn, for City of Dearborn.

James E. Tobin, Miller, Canfield, Paddock & Stone, Detroit, Mich., for defendant School Dist. of City of Dearborn.

OPINION

RALPH M. FREEMAN, District Judge.

This is a class action suit alleging violations of plaintiffs' rights under the Fifth and Fourteenth Amendments of the United States Constitution by the City of Dearborn, its officials and the Dearborn School Board. The plaintiffs are property owners, past and present, and other residents of two areas of Dearborn located generally in the southeast section of the City. They seek injunctive relief to stop certain clearance activities conducted by the City in the subject areas, claiming that these activities have constituted a taking without due process of law and have denied them equal protection. In addition, plaintiffs request that individual members of the classes be permitted to file damage claims against the City subsequent to a determination that equitable relief will be granted. For the reasons stated in this opinion, the court finds that the City and its officials have taken plaintiffs' property without due process of law. However, no violation of plaintiffs' rights to equal protection is found. The court also finds that the Dearborn School Board has not denied plaintiffs due process or equal protection.

The first area involved in this suit is known as the Eugene-Porath area. It is circumscribed by Michigan Avenue on the north, Wyoming Street on the east, the Ford Expressway and its exit ramps on the south and west. The second area is known as the South End and is generally circumscribed by the Penn Central R.R. on the north, the Dearborn City limits on the east and south, and the Chesapeake & Ohio R.R. on the west. To the south of Eugene-Porath and to the west of the South End is located the Ford Motor Company Rouge Plant. A map of the South End is appended to this opinion for aid in understanding the discussion that follows.

The named plaintiffs in this case represent six subclasses as designated by order of this court dated June 12, 1972. Those subclasses are:

1. Homeowners in the Eugene-Porath area;
2. Homeowners north of Lapeer Street in the South End;
3. Homeowners south of Lapeer Street in the South End;
4. Former homeowners of the South End and Eugene-Porath areas;
5. Past and present tenants of the South End and Eugene-Porath areas;
6. Neighborhood associations, including the Southeast Dearborn Community Council and the Eugene-Porath Community Association.

Defendants, other than the School Board, requested that this court reconsider the designation of this case as a class action after hearing the evidence adduced at the trial. However, no facts were brought out at the trial that would change the opinion rendered on this matter. Thus the court reaffirms its opinion of May 17, 1972 and its subsequent order permitting this case to proceed as a class action.

The defendants include the City of Dearborn, various departments and divisions of the City, including the City Council, Orville Hubbard, the mayor, Simon Banda, Director of Housing, Mario Manarino, Director of Community Development, William Martin, Superintendent of Building and Safety, and John Nagy, City Planner, and others. The plaintiffs have also sued the Dearborn School Board. In this opinion we will refer to the City and all of its officials as "the City". This reference does not include the School Board which will be referred to separately.

■■ Jurisdiction in this matter is based upon 28 U.S.C. §§ 1331 and 1343(3) and 42 U.S.C. § 1983, plaintiffs

having alleged that they have been damaged individually in an amount in excess of $10,000 and that their constitutional rights have been violated. We note that since the trial of this case, the Supreme Court has made it clear that cities and municipalities are not subject to suit under § 1983 for either equitable relief or money damages. See City of Kenosha, Wisconsin v. Bruno, 412 U.S. 507, 93 S. Ct. 2222, 37 L.Ed.2d 109, decided June 11, 1973; Moor v. County of Alameda, No. 72–10, decided May 14, 1973, 411 U. S. 693, 93 S.Ct. 1785, 36 L.Ed.2d 596. Thus this court has no jurisdiction over the City itself under § 1983. However, this does not prevent individual City officials from being sued under § 1983, and the court would still have jurisdiction over the City under § 1331.[1]

■ The only challenge to jurisdiction by the defendants was made by the City in its Answer to the First Amended Complaint in which it said, "Plaintiffs have failed to show that defendant, or its agents have acted under color of law." Clearly the City and its agents have been acting under color of state law which is the requirement of § 1983. Of course, the City is not liable under that section, but not for the reason stated in the answer. Moreover, the agents of the City are covered by the language of the statute. Therefore, we reject the only objection voiced by the defendants to this court's jurisdiction.

Several incidental matters should be clarified before discussing the facts of this case. Plaintiffs introduced the testimony of Dr. Barbara Aswad together with a survey conducted by her. This occasioned serious objections by the defendants as to the relevancy of the survey material. Because we are able to reach a result favorable to the plaintiffs without consideration of this testimony based upon the survey, we find it unnecessary to determine the admissibility of the survey evidence.

1. For a discussion of the history and the relationship of § 1331 and § 1343(3), see Cronander, Lynch v. Household Finance Corp.:

Jurisdictional Ramifications, 24 Stanford L. Rev. 1134 (1972).

Secondly, the plaintiffs sought to introduce certain exhibits against the City which were admitted against the School Board. We find that the School Board and the City are separate legal entities and that documentation produced by the School Board would not necessarily be admissible against the City. Even though the School Board may have kept these documents at the command of certain statutes, nevertheless, we do not think that this makes them admissible against the City who had nothing to do with their preparation or the activity which precipitated their compilation.

We also note that the individual defendants, including the mayor, have never answered the Complaint in this matter and are technically in default. Answers have been filed on behalf of the School Board and the City alone. Nonetheless, the City Attorney for Dearborn has proceeded as though he represented all individual defendants and we will treat them as such even though he has never filed an appearance in this matter.

Turning now to the events in this case, we note that the Complaint was filed in October of 1971. The court subsequently granted plaintiffs' motion for a preliminary injunction on March 22, 1972 restraining defendants from acquiring any property in the affected areas until a decision on the merits could be reached. In the interim, the court held hearings on individual properties and permitted the City to buy houses where the owner expressed that particular hardship would occur unless the City were allowed to purchase the property. The City was also restrained from soliciting sales of property and destroying or rezoning property.

Trial was begun in this case February 6, 1973. From those proceedings and from various admissions and stipulations of the parties, the court makes the following findings of fact.

### Findings of Fact

1. The City intends to clear the area of the South End north of Lapeer by purchase, to demolish all structures, and to rezone the area for industrial and business use. The City also intends to clear the Eugene-Porath area and to rezone it for industrial and business use.

2. The City undertook to complete this program of clearance through the following projects:

(a) the North Roulo Project, which was the only project funded by the federal government;

(b) the Ferney Street Project, the Tractor Street Project, and the Robert-Edsel-Marie Clearance Project, all of which were authorized by city ordinances, 5–517–68, 7–681–66 and 5–516–68, respectively, in which the City Council resolved that the areas or streets in question were slums, blighted, deteriorated and appropriate for clearance;

(c) the Akron-Holly Clearance Project and the Roulo-Amazon Urban Renewal Clearance Project, which were created by inclusion in the Capital Improvements Planning Program (CIPP) of 1968–1973, and the Salina Street Clearance Project, created by inclusion in the 1970–1974 CIPP.

3. Presently the City has three clearance projects:

(a) the Ferney Street Project, mentioned above;

(b) the Salina District Clearance Project, which includes all of the above projects requiring additional clearance; and

(c) the Eugene-Porath Clearance Project.

4. The Salina District Clearance Project and the Eugene-Porath Clearance Project were authorized only by their inclusion in the 1971–1975 CIPP.

5. There is no present announced plan or project of the City for the clearance of the South End area south of Dix.

6. The City has never stated specifically from whence it derives its authority to carry out these projects. At one point the City Council passed ordinance

69–1626 which stated that the projects were being carried out under the Rehabilitation of Blighted Areas Act; however, the City did not thereafter follow the procedures set forth in that Act. Although the City established the District Council provided for in the Act, the council met only once and the terms of the members expired without any reappointments.

7. The City also has a policy or program operating throughout the City to purchase and demolish garage-type homes, i. e. homes situated on the rear of the lot. The City has stated in its Answer to the Amended Complaint that this action is taken pursuant to M.S.A. 5.2891, M.C.L.A. § 125.519. This statute was repealed in 1968.

The City's Master Plan provided for the clearance of the South End north of Lowrey, and the clearance of Roulo and Amazon Streets from Dix northward.

9. There was no notice to any of the people in these clearance areas that the City Council was contemplating discussion or approval or financing of these areas for clearance.

10. The City did send notice of its intent to clear the Tractor, Ferney, Robert, Edsel, and Marie Streets after Council approval of the projects to the people of those areas.

11. The City has not used its power to condemn property in the South End or Eugene-Porath areas.

12. Dearborn has a very strict and all-encompassing building code.

13. In order to acquire property in the subject areas, the City through its agents including the defendants, has encouraged people to sell their property to the City. This court finds as a matter of fact that the following activities forced people to sell to the City. In part these activities extended to the areas not scheduled for clearance as well as that area north of Dix scheduled for clearance and the Eugene-Porath area.

(a) In Eugene-Porath the City bought homes and cleared them for a tot lot even though a 10.9 acre park exists immediately adjacent to that area which itself is composed of only four blocks and 125 houses.

(b) The City has used its power to issue building permits, repair permits and occupancy permits to encourage people to move out by denying permits, verbally discouraging repairs, or causing unreasonable delay in the issuance of permits. The City also occasionally required complete remodeling of a house when a permit for only one kind of remodeling or repair was requested. Some persons in the subject areas also signed forms stating that any repairs permitted by the City would not be taken into account in computing the value of their home should the City later acquire it. Although there was no direct evidence linking the City to these forms, we infer that only the City could be responsible for such forms that inured to its benefit alone.

(c) The City considers any building less than sixteen feet from the rear lot line to be substandard, regardless of the condition of the house.

(d) Dearborn is less active than most communities in the metropolitan area in working with its pollution problems, despite its power to do so under state law and city ordinances.

(e) Manarino, City Director of the Community Development Department, told people in the areas that the prices paid by the City for their properties would be going down or that there was a fixed maximum price for homes in the area.

(f) The City has required persons in the South End to perform maintenance and install items not required by the building code, including the installation of mechanical garbage disposal units under an ordinance which does not compel mechanical disposals as the only method of garbage disposal. Thus, ordinance 63–1439, Sec. 4.6 provides:

> Every unit shall have adequate garbage disposal facilities or garbage storage containers, the type and location of which are approved by the superintendent.

(g) Many persons have solicited the court during the pendency of the temporary injunction asking that they be permitted to sell because, among other reasons, they fear that they cannot comply with the Dearborn building code. This indicates the effect of activities of the City in denying permits or requiring excessive repairs.

(h) City-owned lots in the South End are often unsightly and unkept.

(i) The City has contributed to pollution in the South End by selling property acquired in the North Roulo Project to Levy, a large processor of asphalt, and Mercier, a brick manufacturer, whose operations contribute significantly to pollution in the South End.

(j) The City has destroyed the private market through-out the South End and Eugene-Porath areas by certain activities, including the following:

(1) City officials have informed residents or prospective buyers that there is no Federal Housing Association Insurance available in these areas;

(2) Recently, homeowners have had difficulty locating private buyers. Although part of this may be due to the aging character of the neighborhood, the Eugene-Porath area, for example, has experienced a drop in sales which could only be attributed to the announcement of the clearance project;

(3) City officials have informed FHA and commercial lenders that part of the South End and all of the Eugene-Porath areas will be cleared for industrial use;

(4) The records of the Detroit FHA office indicate that no mortgage insurance is available for the South End north of Dix. Mortgage insurance for homes located in the remainder of the South End and the Eugene-Porath areas will be evaluated on a case-by-case basis;

(5) City-owned lots in the South End are not put back on the market; in other parts of the City, lots purchased by the City are sold if no public reuse is planned. The only lots sold by the City in the South End were purchased by industrial concerns;

(6) In at least one instance, the City discouraged a private purchaser and then bought the house itself.

(k) A city attorney, acting as attorney for an estate that owned property in the Eugene-Porath area, told the family that the City would purchase that property. He also told the family that it would be difficult to get an occupancy permit for the home because the City wanted to clear the area and consequently the inspectors would be very hard on the property in question.

(l) The City has held many meetings in the South End with residents and has told them repeatedly that the South End will be cleared, north of Lapeer or north of Lowrey.

(m) The City has made press releases stating that Eugene-Porath and parts of the South End will be cleared.

(n) The City has posted various signs throughout these areas which encourage people to sell to the City. On occasion the City has posted large signs which said, "Whoever wishes to sell to the City of Dearborn, call City Attorney," followed by a telephone number. The City has posted signs, "Sold to City of Dearborn" on property acquired by the City in these areas.

(o) The City has allowed property it has acquired to remain vacant and unprotected, to induce neighbors to sell. On some of these properties the City posted signs which stated, "Free at your risk, take any part of the house. First come, first served. Hurry." These signs precipitated stripping of the houses to the consternation of the neighborhood.

(p) The City bought the Roulo School and leased the yard area to Transport Pool, Inc. for the parking of full size semi-trailer trucks in violation of its own zoning ordinance 501.127.

(q) The City through its officials, including defendant Manarino, solicited

sales of property in the subject areas. Quinn Smet, Director of Urban Renewal in the 1960's, said he spent one-half of his time soliciting sales of homes in the South End. This activity was extended into the Eugene-Porath area. As mentioned above, the City also posted large signs in the two areas which said, "Cash for your house. The City will pay a good fair price for any house in this block. See City Attorney, City Hall."

(r) If an owner in the South End made a request for a substantial repair permit in 1968, the City would offer to buy his house.

14. The City acquired 20 houses in the Eugene-Porath area between May of 1971 and February of 1973, keeping in mind that a temporary injunction issued March 22, 1972 prohibited all but court-approved acquisitions.

15. The City acquired property in the South End and Eugene-Porath areas as follows: Up until 1965, the City acquired 58 lots in the South End and 3 in Eugene-Porath. Between 1965 and 1969 the City acquired 159 lots in the South End and 9 in Eugene-Porath. Between 1969 and February 1973, the City acquired 109 lots in the South End and 18 lots in Eugene-Porath. These figures include acquisitions in the North Roulo Project. Presently the City owns ¾ of the lots in the Tractor Street area; the majority of homes on Ferney Street; 40% of the homes on Robert, Edsel and Marie Streets; 26 lots on Salina from Eagle to Lapeer, and 36 lots on Salina from Dix to Lapeer.

16. The City has never enacted a relocation plan or provided funds for a relocation plan specifically for the clearance projects in the South End or Eugene-Porath areas. It is clear from the testimony of Mr. Manarino, the City has not embarked upon even the most initial phases required by the Michigan Relocation Assistance for Displaced Persons Act, M.S.A. Sec. 8.215(61) et seq., M.C.L.A. § 213.321 et seq.

17. The City does have a relocation service that is available to anyone who walks off the street. This program has relocated four people from the South End and one from Eugene-Porath. However, this relocation program only provides information about available rental housing.

18. Eighteen people from both areas have been relocated in the City's senior citizens' housing.

19. Manarino and other City officials have helped various people to relocate on an ad hoc basis. Nevertheless, the City has not enacted any definite plan to care for persons displaced by the City's projects in these areas.

20. Contrary to plaintiffs' contention, the testimony showed that the level of city services in these two areas, such as recreation, garbage pick-up, street cleaning, library service, etc. is equal to that provided in the rest of Dearborn.

21. The City never suggested that an owner consult a third party about the value of property which the City sought to buy. The price offered by the City was often $5,000 less than the price the owner asked; sometimes the difference was even greater. This fact becomes significant when viewed in light of the method used by the City to determine the price it offered. Mr. Manarino, Director of the Department of Community Development since 1969, stated that when he solicits sales in these areas, his offering price is based upon consideration of:

1) Comparable sales in the area;

2) The assessed value;

3) What the owner asks; and

4) What the owner paid for the property.

Quinn Smet, Director of the Department of Urban Renewal from 1965 to 1969, stated that when he solicited sales in the South End, he determined his offering price by looking to:

1) The assessed value;

2) Comparables in the area and in East Dearborn; and

3) Condition of the house.

Smet went on to say that in 1968 the Mayor told him to use comparable property from the South End alone in computing value. Following this directive, Smet found that he could not compute a high enough value to entice owners to sell. When he informed the Mayor of this fact, the Mayor put a moratorium on buying by the City, allowing ten or twelve options to buy held by the City to expire.

22. We find as a matter of fact that the effect of any clearance project such as that conducted by the City of Dearborn is to depress the value of property for the immediate future. Thus, the use of comparables from the area in computing the value of a home would result in a lower price.

23. Testimony of Charles E. Morley, Director of Wayne County Bureau of Taxation, indicates that Dearborn residential property has been assessed at the following percentage of true cash value over the last four years:

| | |
|---|---|
| 1972 | 17.8 % of true cash value |
| 1971 | 18 % |
| 1970 | 19 % |
| 1969 | 20.51% |

Thus the use of the assessed value by the City in determining the value of homes could also contribute to computation of a low price.

24. The testimony also indicated that many of the people in the South End have owned their homes ten years or more. Thus the price they paid for their homes has little to do with present value. The City does not have a formula for computing the rise in market value of homes, taking into account inflation and other factors, over any period of time.

25. The City also offered testimony that it paid approximately $100 to $125 a front foot for lots in the South End and for garage homes regardless of the condition of the home.

26. Plaintiffs offered the testimony of a real estate appraiser as to the value of two homes, one located in Eugene-Porath and one located in the South End. He also made estimates of value of homes that have been bought and torn down by the City. These estimates were based upon photographs of the houses and statements of persons who had seen the properties. His appraisals or estimates were always significantly higher than the price paid or offered by the City. Nevertheless, because of the limited number of actual appraisals, we are unable to infer from this evidence that the City paid unfair or unreasonably low prices. We also note that an appraiser, called by the City as its witness, tended to contradict the testimony of plaintiffs' appraiser.

27. From these facts this court finds that the City has not been offering fair compensation to the home owners in the South End or in the Eugene-Porath areas from whom the City has acquired homes or to whom the City has made offers.

28. Census data introduced by plaintiffs shows that the South End and Eugene-Porath areas of the City of Dearborn have the lowest income per family, the highest number of families below the poverty level, the lowest median value for homes and the lowest value of median rent of any areas in the City.

29. Defendant School District is governed by a seven member Board of Education and is an entity entirely separate and distinct from the City of Dearborn. Hence, neither entity has any control over the operations of the other.

30. The School District sold the Roulo School property to the City for full consideration in 1962. Plaintiffs complain of certain activities by the City in connection with this property after its acquisition by the City, but there is no claim or proof of any improper action by the School District in making this sale.

31. In January 1969, the School Board adopted a plan whereby the seventh, eighth and ninth grades of Salina School (which at that time covered grades one through nine) would be gradually phased out, one year at a time, beginning with the seventh grade in the 1969–70 school year. The first phase of

this plan was in fact implemented, with the seventh grade children being bussed to another school during the 1969–70 school year. However, in March 1970, after community protest and a series of meetings, the School Board rescinded this plan. The seventh grade was restored at Salina School for the 1970–71 school year, and the school basically continued to operate as before.

32. There is no evidence whatever that the School District was acting on the basis of any factor other than legitimate educational considerations in connection with the above described events. There is no evidence whatever of any conspiracy, plan or concert of action of any kind between the School District and the City in this regard or in any other respect.

33. Certain changes in some of the adult education classes and other special programs at Salina School were made, but in so doing there was no showing of discrimination or of any intent to aid the City in its clearance program.

### Conclusions of Law

The plaintiffs contend that the actions delineated above constitute a taking of property without due process of law. The Fifth Amendment of the Constitution of the United States provides that no person shall be "deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation." This amendment applies to the states, their agencies and their subdivisions through the Fourteenth Amendment. Plaintiffs contend that defendants' actions amount to a taking and that they have not provided fair opportunity for the determination of just compensation.

This court must first determine whether there has been a taking of private property under the facts of this case. The term "taking" implies the acquisition of property by the government without regard for the wishes of the owner. A taking can be accomplished by use of governmental powers of eminent domain or it can be accomplished by other kinds of governmental action. Thus in Eyherabide v. United States, 345 F.2d 565, 170 Ct.Cl. 598 (1965), the court held that the government had temporarily taken property belonging to the plaintiff for which he was entitled to compensation when the government had mistakenly considered plaintiff's farm to be a part of an adjacent naval gunnery range. The impact on plaintiff's property was devastating. Plaintiff was unable to hire a caretaker, shells were scattered over his land, improvements on the farm were destroyed, and the property was subjected to vandalism. Under these circumstances, the court found that a taking had occurred.

Likewise in United States v. Kansas City Life Insurance Company, 339 U.S. 799, 70 S.Ct. 885, 94 L.Ed. 1277 (1950) the court found that there had been a taking of property where the government built a dam which permanently raised the water table of plaintiff's land to such an extent that he was unable to farm his land.

In Matherson v. Long Island State Park Commission, 442 F.2d 566 (2d Cir. 1971) the plaintiff alleged that the Commission's police were preventing plaintiff's customers from entering the parking lot of plaintiff's establishment. The court, in reversing the dismissal by the lower court, said, "It may be that appellants can prove such harassment and interference as to amount to a deprivation of property without due process." Although that case has evidently not yet been decided on the merits, the comments of the circuit court indicate that harassment by a public body can constitute a taking of private property.

In Madison Realty Company v. City of Detroit, 315 F.Supp. 367, 371 (E.D. Mich.1970) Judge Keith of this court held

The totality of these acts by the Defendant City contributed to and accelerated the decline in value of plaintiff's property in 1962 so as to consti-

tute a "taking" of that property within the meaning of the 5th Amendment to the United States Constitution.

The acts to which Judge Keith referred included denials of building permits, denial of a reassessment of the property for tax purposes, continued publication of plans for renewal of the area and denial of some city services.

In Foster v. City of Detroit, 254 F. Supp. 655 (E.D.Mich.1966), aff'd 405 F.2d 138 (6th Cir. 1968) Judge Kaess of this court found that actions of the City constituted a taking of property before the actual condemnation of the property occurred. The City of Detroit in *Foster* had announced condemnation proceedings against an area which included the plaintiffs' property. Condemnation proceeded for approximately ten years during which time plaintiffs' property was not taken and plaintiffs were told not to make major improvements to their property because they would not be compensated therefor by the City. Plaintiffs' property became vandalized and not rentable due in part to the change in the neighborhood. Ultimately plaintiffs were forced to raze their buildings. Then after ten years the condemnation proceedings were discontinued only to be reinstated one year later. Plaintiffs' property was ultimately condemned and plaintiffs were compensated for the value of their now vacant lots. Judge Kaess noted in that opinion,

> Generally, the term "taking" is construed in its literal sense, that is, a taking occurs when the verdict is confirmed, the deed executed, and the award paid. There are, however, special situations where the actions of a governmental body are such as to amount to a taking of private property, regardless of whether there is an eminent domain proceeding, and in such situations, compensation is given for the taking when it occurs. *Supra*, p. 663.

The court went on to hold that "the actions of the defendant which substantially contributed to and accelerated the decline in value of plaintiffs' property constituted a 'taking' of plaintiffs' property within the meaning of the Fifth Amendment, for which just compensation must be paid." *Supra*, 665–666.

Lastly, we note the case of Drakes Bay Land Company v. United States, 424 F.2d 574, 191 Ct.Cl. 389 (1970) in which the court found a taking although the government had not as yet condemned the land in question. In that case the National Park Service indicated to plaintiff that it intended to acquire plaintiff's land. Plaintiff then refrained from developing the land into a residential subdivision. Subsequently, plaintiff asked the government to pay for its land or exchange the land for other federal land. The government refused, although it was clear that the government intended to acquire the land on some date in the future. The court found that the plaintiff had been deprived of a private market to which he could have sold his land because of the threat of imminent condemnation. The court also found that the government had not acquired the land for ten years following its first discussion with plaintiff because they did not have funds to acquire all of the land surrounding plaintiff at one time and also because they knew and took advantage of the fact that plaintiff was hamstrung and could not dispose of his land except to the government. The court found such a situation to amount to a taking by the government.

■ Under these cases it is clear that activities other than actual condemnation can amount to a taking. There are many similarities between the case at bar and the *Foster* and *Madison Realty* cases. Although none of the activities of the City standing alone may have constituted a taking of plaintiffs' property, this court finds that the combination of the City's announcement and attendant publicity of the clearance projects, the City's refusal to issue certain repair and building permits coupled with its efforts to discourage repairs, the lack of care of City-owned property, the

posting of signs on vacant buildings which invited vandalism, the posting of large signs in the area offering to buy property, the solicitation of sales to the City, the City's lack of initiative to control pollution in the South End, and the gradual acquisition of properties in both areas resulted in the taking of property in these areas for which homeowners are entitled to just compensation.

Secondly, this court will look to the public purpose of these various clearance projects of the City. Under the law of Michigan, the City of Dearborn is permitted under M.S.A. 5.2078(2), M.C.L.A. § 117.4e to provide in its charter for

> acquisition by purchase, gift, condemnation, lease or otherwise of private property, . . . for any public use or purpose within the scope of its powers, whether herein specifically mentioned or not.

Thus the City of Dearborn, having admittedly adopted this provision in its charter, is limited to acquisitions of property for a public purpose. Plaintiffs ask us to determine whether or not the clearance projects have a public purpose.

The case law discussing the power of a court to review a determination of public purpose by other branches of the government is conflicting on the surface. Thus, in Cincinnati v. Vester, 281 U.S. 439, 50 S.Ct. 360, 74 L.Ed. 950 (1930) we have the Supreme Court saying that the determination of public purpose can be a judicial one, but in Bragg v. Weaver, 251 U.S. 57, 40 S.Ct. 62, 64 L.Ed. 135 (1919) the Court said that the necessity of a public taking is a matter of legislative concern. Likewise in Berman v. Parker, 348 U.S. 26, 75 S.Ct. 98, 99 L. Ed. 27 (1954) the Supreme Court said:

> We do not sit to determine whether a particular housing project is or is not desirable . ' . . It is within the power of the legislature to determine that the community should be beautiful as well as healthy, spacious as well as clean, well-balanced as well as carefully patrolled. In the present case,

the Congress and its authorized agencies have made determinations that take into account a wide variety of values. It is not for us to reappraise them.

But as the Sixth Circuit pointed out in United States v. Agee, 322 F.2d 139, (6th Cir. 1963) there is no case which holds that the courts cannot review a determination of public use at all. In that case the court held that the scope of judicial review in this area is very narrow, but that a court may nonetheless determine whether or not a determination of public use has been made in bad faith. In *Agee* the court affirmed the lower court's holding that the taking had not been in bad faith.

 We note that the court has no power to go beyond a determination that the legislative body has acted in bad faith or in an arbitrary manner. For example, the court cannot change the boundaries of a particular project. Woodland Market Realty Company v. City of Cleveland, 426 F.2d 955 (6th Cir. 1970).

In the case at bar there are at present three clearance plans, the Ferney Streets Clearance Project, the Salina District Clearance Project, and the Eugene-Porath Clearance Project. The Ferney Street Clearance Project was authorized by Ordinance 5–517–68 in May of 1968, which stated that the area was a slum. This indicates at least a purpose for the proposed clearance which undoubtedly is within the power of the City, e.g. M.S.A. 5.3012, M.C.L.A. § 125.652. However, the only official action recognizing the Eugene-Porath project is its inclusion in the 1971–1975 and 1972–1976 CIPP. Nowhere in these documents is there any indication of the public purpose behind this project. The documents simply provide for clearance of the area for redevelopment of commercial and industrial use.

The Salina District Clearance Project was created in 1971 by transfers to it of the Tractor Street Clearance Project, the Robert-Edsel-Marie Clearance Proj-

ect, part of the Salina Street Clearance Project plus all other areas of the South End north of Lapeer, including part of Roulo and Amazon Streets, and part of Wyoming, north of Lapeer. No specific purpose that could be deemed to be a public purpose is set forth in the CIPP in which the Salina District Clearance Project appears for the first time. The CIPP for 1971–1975 is the first and only official action designating this clearance project, except for subsequent CIPP. But even though no specific purpose is set forth for the Salina District Clearance Project (SDCP), the project is being carried out for a public purpose to the extent that it is made up of prior projects for which a public purpose was established. This would include, however, only Tractor Street and Robert, Edsel and Marie Streets Ordinance 5–516–68 provided for clearance of Robert, Edsel and Marie Streets and ordinance 7–681–66 provided for clearance of Tractor Street. These ordinances as stated in the findings of fact also stated that the proposed clearance areas were slums, blighted and deteriorated. We agree that such a finding would constitute a public purpose for clearing the area.

However, as to the remaining areas contained in the Salina District Clearance Project, we have been presented with no official action which sets forth any public purpose for their clearance. Again we are left with bare statements in the CIPP for the various years in which these areas were designated as Urban Renewal Areas, etc., with no explanation of public purpose. Thus insofar as the SDCP encompasses Roulo, Amazon, Wyoming and Salina Streets north of Lapeer, acquisitions under this program are illegal in that no public purpose has ever been established.

The remaining program of the City involving the South End is called the Dix-Vernor Conservation Program. It is described in the CIPP as being a project for the "acquisition and removal of substandard structures, code enforcement and relocation housing in the area south of Lapeer." No particular public purpose is designated for this project which includes acquisition of homes in the area.

As noted heretofore the City under its charter only has power to acquire property for a public purpose. In the case of the Eugene-Porath area and parts of SDCP, no public purpose has been designated. Industrial and commercial use by itself does not constitute a public purpose. See *Berman,* supra. As to the Ferney Street Project it appears that the City has determined a public purpose for the clearance of this area. Since there was no evidence presented to the court as to the condition of this particular area we have no basis upon which to find that the determination of the City that this area was a slum was made in bad faith. The same is true for the Robert, Edsel, Marie and Tractor Projects incorporated into the SDCP.

As to the Dix-Vernor Conservation Area, the City has authorized the acquisition of substandard structures. This would qualify as a public purpose, but the City may only acquire homes for that purpose and no other.

Thus we find that City acquisitions under the Eugene-Porath Clearance Project and certain portions of the Salina District Clearance Project are illegal because the City has not, in accordance with its charter, determined the public purpose for these projects as provided in specific state statutes. Acquisitions under the Ferney Street Project, the old tractor Street Project, and the former Robert, Edsel, Marie Project, however, have been taken for a specified public purpose. As to the Dix-Vernor Conservation Project, acquisition can only be made as provided in the CIPP, namely, to acquire substandard homes.

We further note that it is City policy to acquire garage-type homes which are homes situated less than 16 feet from the rear lot line. This policy results in the taking of private property, inasmuch as the City will not permit such homes to be sold or re-occupied,

and has no public purpose which has been pointed out to the court. In fact the City purports to rely upon M.S.A. 5.-2891, M.C.L.A. § 125.519 as their authority for acquiring garage-type homes, claiming that this state statute makes such housing illegal. (See defendants' answer to First Amended Complaint, p. 18, ¶ IV, A, 9(i).) However, this statute was repealed by the Michigan legislature in 1968. Thus defendant has no basis for its action and, hence, no public purpose has been established. Thus, this court finds that purchases by the City of garage-type homes without regard to condition are illegal.

■ However, we find no requirement in the case law or in the Constitution for a hearing and notice of the hearing to people affected by a determination of public purpose. The Supreme Court said in Bragg v. Weaver, supra, 251 U.S. at p. 58, 40 S.Ct. at p. 63,

> Where the intended use is public, the necessity and expediency of the taking may be determined by such agency and in such mode as the state may designate. They are legislative questions, no matter who may be charged with their decision, and a hearing thereon is not essential to due process in the sense of the Fourteenth Amendment.

Although *Bragg* is not a case of recent vintage, we have found no case which casts any doubt on this language.

The cases cited by plaintiffs go to the point in time when such determination of necessity and expediency is converted into substantive action. Thus, in Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972) and Sniadach v. Family Finance Corp., 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969) the court did not hold that a hearing with notice should have been provided upon the enactment of the statutes in question, but that before they could be enforced so as to actually take away plaintiffs' property, they, the plaintiffs, would be entitled to a hearing and notice of the hearing on the proposed taking.

Thus we cannot go along with the suggestion of plaintiffs that they are entitled to notice of any hearing where a determination of a public purpose is to be made which may affect their property.

■ Thus far this court has determined that the City of Dearborn through its agents, including the defendants in this case except the School Board, has mounted a campaign in the South End and Eugene-Porath areas that constitutes a taking and that many of the sub-plans and clearance projects have been without a public purpose. However, the City Council has in some instances set forth a public purpose of sorts and may in the future determine a public purpose for the clearance of the other areas not yet so designated. However, merely stating that certain activity constitutes a public purpose is not sufficient. See City of Cincinnati v. Vester, supra. Nevertheless, for those areas where the City has set forth a public purpose, and since we have found that a taking of private property has occurred throughout the South End and the Eugene-Porath areas, we will now determine whether the City of Dearborn through its agents has justly compensated those persons who have sold properties in these areas to the City.

■ We refer again to the case of Bragg v. Weaver, supra. Following the quotation set out above, the court went on to say at p. 59 of 251 U.S., at p. 63 of 40 S.Ct. 64 L.Ed. 135,

> But it is essential to due process that the mode of determining the compensation be such as to afford the owner an opportunity to be heard.

In other words, the concept of the condemnation jury or commission is mandated by the Constitution in the situation of a taking for public use. It is this concept of requiring an opportunity for the owner of property to be heard prior to a taking by the state or its agencies which is the basis of the recent decisions of *Fuentes*, supra, and *Sniadach*, supra. In those cases the Supreme Court held that wages could not be gar-

nisheed without a prior hearing and that pre-judgment replevin without a prior hearing or notice violates the Fourteenth Amendment. The court said in *Fuentes,* at page 82 of 407 U.S., at page 1995 of 92 S.Ct.,

> This is no new principle of constitutional law. The right to a prior hearing has long been recognized by this Court under the Fourteenth and Fifth Amendments. Although the Court has held that due process tolerates variances in the *form* of a hearing "appropriate to the nature of the case," and "depending upon the importance of the interests involved and the nature of the subsequent proceedings [if any]," the Court has traditionally insisted that, whatever its form, opportunity for that hearing must be provided before the deprivation at issue takes effect.

In the case at bar the homes of individuals are involved. If the City takes property it must provide an opportunity for a hearing on the price it is to pay.

 Plaintiffs also assert that defendants' activities have resulted in a denial of equal protection because the clearance programs have only been instituted in the South End and Eugene-Porath areas which contain the lowest income families in the City. Plaintiffs introduced the 1960 and 1970 census data that clearly indicates the low economic status of the South End and Eugene-Porath areas.

Nonetheless, there was no indication on the trial of this case of any specific intent to discriminate against low income groups in Dearborn or to remove them from the boundaries of Dearborn. Nor were there the kinds of activities from which one could infer that such was the purpose of the City's activities. Moreover, we note that according to the projects of the City as they now stand, all of the South End south of Lapeer is to be conserved which is not consistent with an intent to drive out the low income families. In the case at bar some of the residents which the City is alleged to be driving out have relocated in the City, in private homes or in the Senior Citizen projects.

In James v. Valtierra, 402 U.S. 137, 91 S.Ct. 1331, 28 L.Ed.2d 678 (1971) the Supreme Court refused to invalidate a California Constitutional Provision that provided that no low rent housing project could be developed in a community without approval of a majority of those voting in a community election. The court held that the mere fact that such a provision tends to fall on low income families did not violate the equal protection clause. See also San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16, Decided Mar. 21, 1973.

In the cases relied upon by plaintiffs, the conduct of the authority was blatantly discriminatory. In Kennedy Park Homes Association, Inc. v. City of Lackawanna, 436 F.2d 108 (2d Cir. 1970) the City completely thwarted attempts to move the black population of the City outside of one ward. Likewise, in Norwalk CORE v. Norwalk Redevelopment Agency, 395 F.2d 920 (2d Cir. 1968) the court held that an allegation that whites were relocated more expeditiously than blacks in a City redevelopment constituted a claim of a violation of the Equal Protection clause of the Fourteenth Amendment. These cases involve the suspect classification of race. Our case alleges discrimination on the basis of wealth which is not a suspect classification. See *Rodriguez,* supra.

Thus we find that the defendants have not violated the Equal Protection clause of the Fourteenth Amendment.

 Plaintiffs have asserted two state claims in addition to the federal claims already discussed in this opinion. The court has no original jurisdiction over these claims, but the plaintiffs urge that we consider such claims under pendent jurisdiction. The City, of course, urges that these claims not be considered.

In the recent case of Moor v. County of Alameda, Case No. 72–10, decided

May 14, 1973, 411 U.S. 693, 93 S.Ct. 1785, 36 L.Ed.2d 596, the court again affirmed the language in the case of United Mine Workers v. Gibbs, 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). In *Gibbs,* the court said at page 725, 86 S.Ct. at page 1138:

Pendent jurisdiction, in the sense of judicial *power*, exists whenever there is a claim "arising under [the] Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority . . .," U.S.Const., Art. III, § 2, and the relationship between that claim and the state claim permits the conclusion that the entire action before the court comprises but one constitutional "case." The federal claim must have substance sufficient to confer subject matter jurisdiction on the court, . . . The state and federal claims must derive from a common nucleus of operative fact. But if, considered without regard to their federal or state character, a plaintiff's claims are such that he would ordinarily be expected to try them all in one judicial proceeding, then, assuming substantiality of the federal issues, there is *power* in federal courts to hear the whole.

The heart of this lawsuit is the manner in which the defendant City has conducted its clearance projects. Thus it seems proper and expeditious to consider those state provisions which defendant is accused of violating in connection with its program.

Plaintiffs first allege that the City is violating a Michigan Act entitled Relocation Assistance for Displaced Persons P.A.1972, No. 227, found at M.S.A. 8.215(61) et seq., M.C.L.A. § 213.321 et seq. This Act, which was effective June 1972, provides in section 2, M.S.A. 8.-215(62), M.C.L.A. § 213.322,

When a program is undertaken by a state agency which will require the acquisition of real property or its vacation by its occupants, the state agency shall provide a relocation assistance advisory services program for dis-

placed persons offering the assistance provided by this act. If the state agency determines that a person occupying real property immediately adjacent to real property acquired under such program is caused substantial economic injury because of the acquisition, the person may be offered relocation assistance advisory services under this act.

The City and its programs are clearly covered by this act. See § 8.215(61)(d). However, the City has not taken any steps to comply with this act although it had been in effect for six months at the time of trial. The City in its post trial brief argues that the act is not applicable because of the temporary injunction issued by this court. However, the only purpose of the injunction was to hold the status quo pending determination of this case. It did not prevent the City from complying with state statutes especially since the City has shown no indication of abandoning its projects.

Secondly, the City has argued that it has complied by using a different method. As we read the act it provides the sole method which may be employed by the City. Therefore we find the failure to take steps to comply with the Relocation Act violates that act since it is clearly applicable.

In addition, the plaintiffs assert that the City has violated the Rehabilitation of Blighted Areas Act, P.A. 1945, No. 344, M.S.A. 5.3501 et seq., as amended, M.C.L.A. § 125.71 et seq. The problem comes about because on March 18, 1969, the City Council passed ordinance No. 69–1626, "An ordinance establishing a district area in compliance with Act 189, P.A.1968, for the redevelopment of an area situate in the southeast part of the City of Dearborn, and providing for the appointment of a citizens' district council." The ordinance went on to state:

WHEREAS: The City of Dearborn is engaged in a redevelopment program under the provisions of Act 344, P.A.1945, and

WHEREAS: Act 189, P.A. being an amendment to Act 344, etc.

Thus it appears that the City began proceedings under the Blighted Areas Act. A District Council was appointed, as provided by the Act, but only one meeting of the Council was held in 1969. Thereafter the terms of the members were allowed to expire and no new appointments were made. Moreover, the City took no other steps to comply with the Act. Since the City has never repealed this ordinance, it is in violation of its own ordinance by not proceeding under the Blighted Areas Act.

Thus the City is directed that should it choose to continue its clearance programs in compliance with other guidelines laid down in this opinion, it must conduct that clearance activity in compliance with the Blighted Areas Act.

While the thrust of plaintiffs' pleadings and proofs as they relate to defendant School District has never been altogether clear, it is apparent that plaintiffs claim basically that defendant School District has taken their property without due process of law and has denied them equal protection of the law in violation of the Fourteenth Amendment. The facts found above fail to support this claim insofar as it relates to the School District's actions when considered alone.

There is likewise no basis whatever for concluding that the School District violated plaintiffs' Fourteenth Amendment rights by acting in concert with defendant City in any way, or by "aiding" defendant City in its alleged unlawful scheme.

To summarize, we find that the defendant School Board has not violated any of the plaintiffs' rights. We find that the City through certain defendants named in the complaint has violated plaintiffs' rights to due process under the Fourteenth and Fifth Amendments. We also find that the City has not violated plaintiffs' right to equal protection under the Fourteenth Amendment. As to the state claims raised in this suit, we find the City to be acting in violation of the Rehabilitation of Blighted Areas Act and the Relocation of Displaced Persons Act.

### Relief

The defendants, Manarino, Martin, Nagy, Banda, Hubbard and the Dearborn City Council and their successors will be enjoined from engaging in the following activities:

1. Soliciting or acquiring by purchase any property in the Eugene-Porath and South End areas, except as hereinafter provided.

(a) The City may acquire substandard properties. A substandard structure shall be defined specifically in the judgment to be entered in this case.

(b) The City may acquire homes on Tractor, Ferney, Robert, Edsel and Marie streets since we have found that the City has established a public purpose. However, acquisitions in these areas may only be made by condemnation. In addition, any acquisitions in these areas must comply with the Blighted Areas Act and the Relocation of Displaced Persons Act.

(c) The City may make purchases heretofore agreed to by the parties after presentation to and upon order of the court.

2. Refusing any certificate of occupancy for any property now standing in the South End and Eugene-Porath areas for its present or most recent use unless the structure is substandard.

3. Denying repair or building permits for the South End and Eugene-Porath areas unless the denial is expressly required by law and also discouraging repairs in these areas.

4. Requiring homeowners to make the repairs themselves.

5. Requiring any statement from the owner that the City will not pay for the increase in value caused by the repair should the City thereafter acquire the property.

6. Interfering with the granting of mortgage money or issuance of mortgage insurance.

7. Placing signs on City-owned property in these areas which would permit salvaging of material contained in the structure.

8. Posting signs soliciting sales of property in these areas to the City, nor shall any sign be placed on property bought by the City announcing their acquisition of that property.

9. Publicizing plans to clear these areas.

10. Acquiring property in the Eugene-Porath area for park lands or tot lots.

11. Changing the zoning of any area located within the Eugene-Porath or South End areas for five (5) years.

Should the City desire to continue the clearance and conservation plans for the South End and Eugene-Porath areas in accordance with this opinion, such projects shall be structured so as to complete clearance within a six-year period.

Individual members of the class who have sold property to the City under the clearance programs for the South End and Eugene-Porath areas may file individual claims against the City for the difference between the price paid by the City and the price later determined to be the fair market value of the property at the time of the taking of the property, such claims to be submitted within forty-five (45) days following the date of filing the judgment in this case. Appropriate notice shall be given to members of the class affected by this provision. Such claims will be referred to a master to review the facts in each case, determine a date of taking in line with this opinion, take testimony and make a determination of value. Should it be found that the City paid less than the value value determined by the master to be the fair market value of the property, the City shall reimburse the owner that amount plus interest at the rate of 5% per annum from the date of the purchase. Should it be found that the City paid just compensation, claimant shall pay costs of the proceeding.

Property in the subject areas presently owned by the City, except property located on Tractor, Ferney, Robert, Edsel and Marie streets, shall be placed on the market by listing it with a real estate broker or by other means to be set forth in the judgment, and shall be maintained as hereinafter set forth.

(a) Structures which are presently vacant shall be boarded up or otherwise protected from fire and vandalism.

(b) Structures which are substandard are to be demolished within sixty (60) days of acquisition or the entry of judgment, whichever shall be the longer.

(c) Vacant property shall be properly maintained.

(d) As to property owned by the City on Tractor, Ferney, Robert, Edsel and Marie streets, the City shall properly maintain vacant lots and demolish or protect vacant structures. The City may sell these properties.

The City is hereby ordered to proceed according to the Relocation of Displaced Persons Act should it decide to continue its clearance program by otherwise complying with this opinion.

The City of Dearborn will not be prohibited from proceeding under any Michigan statute which authorizes clearance or conservation programs so long as the City follows the complete statutory proceedings.

A proposed form of judgment shall be submitted by plaintiffs in accordance with the foregoing relief provisions, which may include other relief provisions not inconsistent with this opinion.

## APPENDIX

DEARBORN CITY PLAN DEPARTMENT-SCALE 1"=1000'-MARCH, 1971