Maurice M. SAYRE, Trustee in Bankruptcy of the Liberty Mortgage Corporation, Plaintiff-Appellee,

v.

The CITY OF CLEVELAND,
Defendant-Appellant.

No. 73–1594.

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 3, 1973.

Decided March 14, 1974.

James A. Smith, Cleveland Ohio, for defendant-appellant; Herbert R. Whiting by Robert W. Jones, Asst. Director of Law, City of Cleveland, James P. Mancino, Issac Schulz, Squire, Sanders & Dempsey, Cleveland, Ohio, on the brief.

Thomas A. Luebbers, City Sol., Thomas Rehme, Asst. City Sol., Cincinnati, Ohio, on brief for amici curiae city of Cincinnati.

James W. Drake, City Atty., Dayton, Ohio, on brief for amici curiae city of Dayton.

Edwin F. Woodle, Cleveland, Ohio, for plaintiff-appellee; Woodle, Wachtel, Begam & Wolk, Cleveland, Ohio, James W. Childs, Van Wert, Ohio, on brief.

Before McCREE and MILLER, Circuit Judges, and McALLISTER, Senior Circuit Judge.

WILLIAM E. MILLER, Circuit Judge.

This appeal raises important questions concerning the extent to which property may be affected by an urban renewal program without being "taken" within the meaning of the fifth and fourteenth amendments to the Constitution of the United States. The facts and procedural history of the case are somewhat complex and require a not incomplete statement.

The appellee Maurice Sayre, is the trustee in bankruptcy of Liberty Mortgage Corporation. In November of 1966 appellee brought an action against the City of Cleveland for damages for loss of income, earnings and property caused by the City's negligence in conducting certain aspects of its urban renewal program.[1] The City moved to dismiss, and soon thereafter the appellee amended his complaint to allege that the City had in fact taken Liberty Mortgage's property without compensation in violation of the fifth and fourteenth amendments to the United States Constitution. Specifically, the amended complaint alleged that the City had notified Liberty Mortgage and occupants of certain of its properties of the City's intention to appropriate numerous parcels of real property owned by Liberty Mortgage. These actions of the City were said to have "constituted the initial steps in the appropriation of the property of plaintiff's bankrupt, which appropriation the defendant City never carried to completion

and which said defendant at no time had the facilities or ability to consummate." Moreover, in the Brief of Plaintiff in Response to Reply Brief of Defendant City of Cleveland, appellee alleged that the "initial steps" taken by the City were the passage of a resolution by the city council declaring its intent to appropriate certain parcels of Liberty Mortgage's property and the subsequent issuance of written notices in conformance with the procedures required under Ohio law for appropriation of property by a municipal corporation. Ohio Revised Code §§ 719.04 and 719.05.

Treating the motion for dismissal as including a motion to strike, the district court ordered appellee to file a second amended complaint, but to omit claims based on negligence and claims for incidental or consequential damages. Sayre v. United States, 282 F.Supp. 175 (N.D. Ohio 1967). However, appellee was permitted to maintain his claim that the City of Cleveland had abused the eminent domain proceedings and taken properties of Liberty Mortgage without just compensation. Fundamental to the decision is the reliance by the district court on appellee's allegation that the City intended to appropriate these properties and, in fact, had already begun the condemnation procedures. These allegations presented questions concerning the abuse of the power of eminent domain which this Court in Foster v. Herley, 330 F.2d 87 (6th Cir. 1964), said was a sufficient basis for the exercise of federal jurisdiction. The following language of the district court is instructive as to its thinking:

> Under Foster v. Herley, supra, it is the law of this circuit that a municipality's claimed abuse in its exercise of the power of eminent domain, with the claimed result of taking private property without just compensation, presents a question of federal jurisdiction under the fourteenth amend-

---

[1]. Originally the United States was also a party; however, the action against the government was dismissed by the district court early in the proceedings. That dismissal is not involved in this appeal.

ment which a federal district court must hear and determine. Plaintiff's amended complaint in charging the defendant City with conduct which tends to state an abuse in the exercise of the power of eminent domain presents a federal jurisdictional question under the fourteenth amendment as interpreted in Foster v. Herley, supra. 282 F.Supp. at 183.

An examination of our opinion in Foster v. Herley, 330 F.2d 87 (6th Cir. 1964), and the district court's opinion on remand, Foster v. City of Detroit, 254 F.Supp. 655 (E.D.Mich.1966), aff'd 405 F.2d 138 (6th Cir. 1968), is crucial to an understanding of the holding of the district court. Foster owned three tracts of land in the City of Detroit. In 1950 the City notified him that it intended to condemn his property and that in the meantime he should do nothing either to maintain or improve the property. A few months later the City instituted formal condemnation proceedings and placed a *lis pendens* against all property in the area. Additionally, the Detroit Common Council passed a resolution freezing the use and management of the property and prohibiting any new buildings or improvements without special permission of council. Despite these initial steps, the condemnation process was never completed; in June of 1960 the City dismissed the proceedings and removed the *lis pendens*. But during this ten year period Foster's property deteriorated because of the apparently imminent condemnation: it became extremely difficult to find tenants for his rental property; vandals looted the empty buildings and fire insurance was cancelled. The entire neighborhood suffered similar problems. Then in 1958 the City informed Foster that because of the delapidated condition of the buildings, they would have to be demolished at his expense. This was done, and Foster was left in debt with three empty parcels of land. Finally, in 1961 Foster learned that the City was again considering condemnation—this time under the Federal Urban Renewal Program.

The new appraisals on the property were at its depreciated, 1961, value.

Foster filed suit in the United States District Court, alleging that the City had abused its power of eminent domain and had so deprived the plaintiff of his use and enjoyment of the property that there was a taking of the property without compensation. The district court dismissed the action because it found that there could be no taking unless the condemnation process was completed and title passed to the City. Once plaintiff's claim under the fourteenth amendment was lost, he was left with a tort action against the City—a cause of action which the federal court did not have jurisdiction to hear since there was no diversity of citizenship. On appeal this Court reversed, holding that pursuant to 28 U.S.C. § 1331, the district court had jurisdiction to hear the merits of the case and then determine whether plaintiff had a valid cause of action under the fourteenth amendment.

The district court on remand heard the case on the merits, finding in favor of the plaintiff. The actions of the City —initiating the condemnation proceedings, refusing to allow improvements and permitting years of delay in the proceedings—were, at the very best, major contributing causes of the decline in value of the area in general and of the plaintiff's property in particular. Although the condemnation process was never formally completed, the City had effectively "taken" plaintiff's property within the meaning of the fifth and fourteenth amendments and was therefore liable for just compensation. This Court affirmed the district court's decision although our opinion was directed mainly to procedural issues raised by the City on appeal.

In the present case the City of Cleveland, after the denial of its motion for dismissal, prepared written interrogatories for appellee to answer. Specifically, the City requested appellee to list those properties which it believed had been taken by the City. Appellee responded by naming 194 properties. In

August of 1972, the City moved for summary judgment. Accompanying this motion was the affidavit of Frederick Pizzedaz, Executive Commissioner of the Cleveland Department of Community Development. Pizzedaz stated that none of Liberty Mortgage's properties involved in the current appeal had been the subject of any council resolution of intent to appropriate for the general neighborhood planning area or the urban renewal project area.[2] Neither had any of said properties ever been designated for appropriation for the urban renewal project nor had any of said properties been the subject of an eminent domain proceeding.

The district court granted summary judgment for the City on 107 of the 194 properties: 29 of the properties were found to have been previously acquired by the City, and 78 were found to be entirely outside the General Neighborhood Renewal Plan Area and not where the urban renewal activity, of which appellee complained, had occurred. But for the remaining 87 properties—those within the General Neighborhood Renewal Plan Area—summary judgment was denied. The district court did not elaborate on its reasons for denying the motion other than to hold that the complaint stated a claim upon which relief could be granted. Also the court stated that appellee had "stated a claim for relief as to which there exists a genuine issue of material fact. . . ." Unfortunately, the memorandum opinion does not state which facts, crucial to the decision, are in dispute. It is from the denial of summary judgment on these 87 properties that the City of Cleveland brings this appeal.[3]

Post-war concern over decaying central cities and blighted neighborhoods led to the passage of the Housing Act of 1949, 42 U.S.C. Sec. 1441 et seq., and the Housing Act Amendments of 1954, 42 U.S.C. Secs. 1450–1462. Briefly stated, the purpose of these programs was to provide financial assistance to communities in order that they might clear slums and blighted areas and rehabilitate old houses where possible. Adequate planning, often a luxury for rapidly changing cities, was encouraged by the Acts, and federal loans were made available to finance the plans. Two types of plans are of particular importance to this appeal. The first, the General Neighborhood Renewal Plan (GNRP), is defined by the Act as follows:

> As used herein, a General Neighborhood Renewal Plan means a preliminary plan (conforming, in the determination of the governing body of the locality, to the general plan of the locality as a whole and to the workable program of the community meeting the requirements of section 1451 of this title) which outlines the urban renewal activities proposed for the area involved, provides a framework for the preparation of urban renewal plans and indicates generally, to the extent feasible in preliminary planning, the land uses, population density, building coverage, prospective requirements for rehabilitation and improvement of property, and any portions of the area contemplated for clearance and redevelopment.

The GNRP serves only as a starting point for planning decisions. The more detailed Urban Renewal Plan specifies the exact properties to be either cleared or rehabilitated; additionally, this plan serves as a basis for funding the renewal program. The Act provides:

> (b) "Urban renewal plan" means a plan, . . . for an urban renewal project, which plan . . . shall be consistent with definite local objectives respecting appropriate land uses, improved traffic, public trans-

---

2. Twenty-nine properties formally belonging to Liberty Mortgage were acquired by the City either through negotiation, sheriff's sale or appropriation. None of these properties is involved in this appeal.

3. The interlocutory order was properly certified for immediate appeal. An order permitting the appeal was entered by this Court.

portation, public utilities, recreational and community facilities, and other public improvements; and (2) shall be sufficiently complete to indicate, to the extent required by the Secretary for the making of loans and grants under this subchapter, such land acquisition, historic and architectural preservation, demolition and removal of structures, redevelopment, improvements, and rehabilitation as may be proposed to be carried out in the urban renewal area, zoning and planning changes, if any, land uses, maximum densities, and building requirements.

In 1961 the Cleveland City Planning Commission and the City Council approved a GNRP and an Urban Renewal Plan for certain blighted areas of the city. The GNRP encompassed an area in excess of 1,600 acres, but it was broken down into subareas I, II, III and IV, indicating the order in which the city would activate renewal plans within the GNRP area. Project I, the University-Euclid Urban Renewal Area Project, covering approximately one-half of the GNRP, was the only project ever adopted by the council, and the only one that was ever funded. A map of both the GNRP and Project I areas was submitted to the government along with the city's application for financial assistance; shaded areas indicated those properties that the city considered for possible appropriation. None of the properties involved in this appeal was designated on the map as a candidate for acquisition.

As already mentioned, the affidavit of Mr. Pizzedaz stated that none of the properties involved in this appeal had ever been designated for appropriation for the urban renewal project nor had any been the subject of an eminent domain proceeding. In his Supplemental Complaint, appellee alleged that the city "directed to the owners and occupants of specific real properties notice of the alleged intention of the defendant to acquire such real properties either by negotiation or by means of appropriate legal action." In the following paragraph appellee continued, "notices of the nature referred to in the preceding paragraph were forthwith directed by defendant to the occupants and residents of almost all of the properties within the Hough area owned by plaintiff's bankrupt." When asked by interrogatory to specify the properties where these notices were received, the appellee listed only fourteen parcels—thirteen of which had already been acquired by the city through either negotiation or appropriation and are not involved in this appeal. One parcel had apparently been the subject of an inquiry by Liberty Mortgage to the City of Cleveland. A letter from the Project Director of the University-Euclid Urban Renewal Project to Liberty Mortgage stated that the property at 1628 Ansel Road "is being proposed for acquisition under a plan change." Mr. Pizzedaz's affidavit states that no eminent domain proceedings were ever initiated as to this property. No further explanation of this letter appears in the record. With the exception of this one letter the record is barren of any affidavits, interrogatories, or evidence of any kind that would support the allegations of appellee's complaint that the City began condemnation proceedings against those properties of Liberty Mortgage involved in this appeal. Quite the contrary, there is substantial support for the conclusion that the City neither intended to take, nor took, any action against any of these 87 properties.

This Court is no stranger to the troublesome legal issues that arise when cities undertake ambitious programs of urban renewal. In Foster v. Herley, *supra*, discussed at length above, we held that a taking may occur even before the city completes the formal procedures usually required before it may actually acquire title to property by condemnation. *See also* Madison Realty Company v. City of Detroit, 315 F.Supp. 367 (E. D.Mich.1970). Once urban renewal is announced and certain areas are desig-

nated for condemnation, predictable changes will occur in the property to be appropriated. Since the owner is forbidden to make improvements, the property inevitably begins to deteriorate. Tenants move out, often leaving empty buildings for vandals who hasten the decline of the neighborhood. Mortgage money disappears while insurance rates soar. Whatever value the property may have had prior to the beginning of the project is rapidly diminished. *Foster* was a recognition that an urban renewal authority, by abusing its power of eminent domain, may cause such substantial damage to property that it is actually "taken" within the meaning of the fifth and fourteenth amendments.

■ But, lest *Foster* be misinterpreted, it should be read in conjunction with Woodland Market Realty Company v. City of Cleveland, 426 F.2d 955 (6th Cir. 1970). There, we considered whether property immediately adjacent to that to be appropriated, is actually taken because of a substantial drop in value caused by the urban renewal project. In finding there was no taking, we said:

> The action of the City has resulted in no diminution of the plaintiff's rights in its property. Its leasehold estate has remained intact. What has altered is the character of the neighborhood, not the character of the plaintiff's leasehold interest. Actions done in the proper exercise of governmental powers which do not directly encroach upon private property, though they may impair its use or value, do not amount to a taking of such property within the meaning of the constitutional provision that private property shall not be taken for public use without just compensation. 426 F.2d at 958.

*Woodland Market* acknowledges the authority of the legislative body to draw its own lines around the property it wishes to condemn by eminent domain. And the crucial geographic boundary is not that around the general planning area or the project area, but around the property that the city has demonstrated that it intends to appropriate. Absent the abuse of eminent domain found in *Foster*, including some action by the city indicating that *the particular piece of property at issue* is to be appropriated, economic loss caused by urban renewal does not constitute a taking within the meaning of the fifth and fourteenth amendments.[4]

■ We are unable to find any judicial support for the broad proposition advanced by appellee in his brief that there is an unconstitutional taking whenever a city in the conduct of its urban renewal program commits acts that lead to the devaluation of property. The converse of this proposition is particularly true where the city, as in this case, has neither initiated eminent domain proceedings, evidenced any intent to begin procedures, or physically invaded the property. In fact, our reading of the cases indicates that this Court in *Foster* possibly broke new ground when it held that abuse of the condemnation authority could constitute a taking. More typically, courts have found that although there can be no taking until the condemnation process was completed, factors such as governmental delay and inaction may be considered in setting the crucial date for valuing the property. *See* City of Cleveland v. Carcione, 118 Ohio App. 525, 190 N.E.2d 512 (1963) ; City of Buffalo v. J. W. Clement Company, 28 N.Y.2d 241, 321 N.Y.S.2d 345, 269 N.E. 2d 895 (1971). *Also, see*, generally, Re-

4. We are aware that in Madison Realty Company v. City of Detroit, 315 F.Supp. 367 (E.D.Mich.1970), a district court of this Circuit said that "[i]nitiation of eminent domain proceedings is not a requisite to a finding that a 'taking' has in fact occurred allowing for recovery by a property owner." 315 F.Supp. at 371. However, that case, like all others, is limited to its particular facts. The district court found in that case that the property owner had been notified by city officials that his land would be acquired. Furthermore, after considerable delay, the city initiated formal eminent domain proceedings.

cent Development, 72 Colum.L.Rev. 772 (1972). The rationale of these cases is that a de facto taking "requires a physical entry by the condemnor, or a physical ouster of the owner, or a legal interference with the physical use, possession or enjoyment of the property or legal interference with the owner's power of disposition of the property." City of Buffalo v. J. W. Clement Co., *supra*, 321 N.Y.S.2d at 357, 269 N.E.2d at 903.

Appellee has cited language in his brief to the effect that governmental action, without any legal proceedings, may constitute a taking. A closer examination of these cases reveals that they invariably arose in the context of either a physical invasion or physical restraint on the land—for example, repeated flooding, Pumpelly v. Green Bag Co., 80 U.S. (13 Wall.) 166, 20 L.Ed. 557 (1871) and United States v. Cress, 243 U.S. 316, 37 S.Ct. 380, 61 L.Ed. 746 (1917); invasion of the airspace, United States v. Causby, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946), and Griggs v. Allegheny County, 369 U.S. 84, 82 S.Ct. 531, 7 L.Ed.2d 585 (1962); and restriction of access, Crawford v. Village of Delaware, 7 Ohio St. 460 (1857), and State ex rel. McKay v. Kauer, 156 Ohio St. 347, 102 N.E.2d 703 (1951). Neither of these cases nor any of the others cited by appellee supports his contention that, absent physical invasion or any action on the part of the city to appropriate the Liberty Mortgage property, a taking has occurred because urban renewal activities of the city may have caused a decrease in property values.

■ The current posture of this case is an interlocutory appeal from an order denying summary judgment. We recognize the discretion of the district court in deciding motions under Rule 56 of the Federal Rules of Civil Procedure, *see* Williams v. Howard Johnson's Inc. of Washington, 323 F.2d 102 (4th Cir. 1963), and we are loathe to overrule the court below when it has found that there is a genuine issue of material fact. Yet when a motion for summary judgment is filed by a defendant supported by affidavits and answers by plaintiff to interrogatories, showing that there is no genuine issue of material fact, with no counter affidavits or other materials being filed by the plaintiff, as was the case here, summary judgment should be granted. *See* Liberty Leasing Co. v. Hillsum Sales Corp., 380 F.2d 1013 (5th Cir. 1967); Surkin v. Charteris, 197 F.2d 77 (5th Cir. 1952). It is significant that although the district court denied summary judgment as to the 87 properties, it did not indicate what facts it believed were in dispute.

However, absent the extreme circumstances present in the *Foster* case, but lacking here, we think the true rule is that there is no de facto taking of properties which have decreased in value because of an urban renewal project unless there is a physical invasion, damage or injury, or a restraint of some type, or action by the City to appropriate such properties. Essentially this was the holding of this Court in Woodland Market Realty v. City of Cleveland, *supra*, and the well-reasoned opinion of New York's highest court in City of Buffalo v. J. W. Clement Company, *supra*, as well as many other cases.

■ The order of the district court denying the City's motion for summary judgment with respect to the 87 properties involved in this appeal is therefore reversed. The action is remanded to the district court for entry of an order granting the said motion and dismissing the action.