Katherine AMEN, et al.,
Plaintiffs-Appellees-Cross-Appellants,

v.

CITY OF DEARBORN, A Municipal Corporation, et al., Defendants-Appellants-Cross-Appellees.

Nos. 82–1281, 82–1282.

United States Court of Appeals,
Sixth Circuit.

Argued June 22, 1983.

Decided Oct. 6, 1983.

William C. Hultgren, Frank A. Guido (argued), Dearborn, Mich., for defendants-appellants-cross-appellees.

Michael J. Barnhart (argued), Barnhart & Mirer, Detroit, Mich., for plaintiffs-appellees-cross-appellants.

Before CONTIE, Circuit Judge, and PHILLIPS and CELEBREZZE, Senior Circuit Judges.

PHILLIPS, Senior Circuit Judge.

This is the second appeal in this class action brought on behalf of present and former residents of the South End and Eugene-Porath neighborhoods in the southeast section of Dearborn, Michigan. Senior District Judge Ralph M. Freeman held, inter alia, that the City of Dearborn had engaged in an unconstitutional course of conduct which deprived plaintiffs of their private property without just compensation. *Amen v. City of Dearborn,* 363 F.Supp. 1267 (E.D. Mich.1973). On the prior appeal, this court remanded on jurisdictional grounds without addressing the substantive merits of the dispute. *Amen v. City of Dearborn,* 532 F.2d 554 (6th Cir.1976). On remand, the district court held that it had subject-matter jurisdiction over the City pursuant to 28 U.S.C. § 1331, and thereafter reinstated its former judgment. The present appeal followed, with the City challenging the decision of the district court on the merits and also the finding of jurisdiction under § 1331. Plaintiffs cross-appeal the district court's refusal to find jurisdiction over the City pursuant to 42 U.S.C. § 1983 and its jurisdictional counterpart, 28 U.S.C.

§ 1343(3). Reference is made to the reported decision of the district court for a detailed recitation of pertinent facts. *See* 363 F.Supp. at 1271–76.

For the reasons set forth below, the decision of the district court is affirmed in part, and reversed in part, and the cause is remanded for further proceedings consistent with this opinion.

## I.

The complaint in this case was filed in October 1971. Jurisdiction over the City was predicated upon two grounds, the general federal question jurisdictional statute, 28 U.S.C. § 1331,[1] and the civil rights jurisdictional statute, 28 U.S.C. § 1343(3).[2] Relying upon *City of Kenosha v. Bruno,* 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973) and *Moor v. County of Alameda,* 411 U.S. 693, 93 S.Ct. 1785, 36 L.Ed.2d 596 *reh'g denied,* 412 U.S. 963, 93 S.Ct. 2999, 37 L.Ed.2d 1012 (1973), the district court held that the City could not be sued under 42 U.S.C. § 1983 and its jurisdictional statute, § 1343(3). *See* 363 F.Supp. at 1270. However, the court concluded that the City could be sued directly for fourteenth amendment violations under § 1331. *Id.*

█ On appeal, this court affirmed the district court's conclusion that jurisdiction over the City could not lie under § 1343(3).[3] *See* 532 F.2d at 558. Although noting that the City could be sued directly for four-

teenth amendment violations under § 1331,[4] this court found the record insufficient as to whether each plaintiff satisfied § 1331's jurisdictional amount requirement. *Id.* at 559–60. *See Zahn v. International Paper Co.,* 414 U.S. 291, 302 n. 11, 94 S.Ct. 505, 512 n. 11, 38 L.Ed.2d 511 (1973) (under § 1331 each class member asserting "separate and distinct claims" had to satisfy the jurisdictional amount requirement). Accordingly, the cause was remanded "in order that the District Court may make specific and detailed findings of jurisdiction." 532 F.2d at 560, quoting *Patrician Towers Owners, Inc. v. Fairchild,* 513 F.2d 216, 222 (4th Cir.1975).

On remand, plaintiffs moved the district court for an order establishing procedures to be followed in determining the amount in controversy as to each class member. Additionally, plaintiffs requested the court to make a finding of jurisdiction under § 1343(3) in light of the intervening decision in *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). It was plaintiffs' position that if § 1343(3) jurisdiction could be established in light of *Monell,* each member of the class would not have to meet the $10,000 jurisdictional minimum since § 1343(3) does not require any monetary amount to be in controversy.

In an unreported memorandum opinion Judge Freeman denied plaintiffs' bid to establish jurisdiction under § 1343(3), holding

1. At that time 28 U.S.C. § 1331 provided, in part, as follows:

    (a) The district courts shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and arises under the Constitution, laws, or treaties of the United States, except that no such sum or value shall be required in any such action brought against the United States, any agency, thereof, or any officer or employee thereof in his official capacity.

2. 28 U.S.C. § 1343(3) provides as follows:

    The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:
    (3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege

or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States;

3. This court held also that the city council, city plan commission, city building and safety division and other city departments could not be sued under § 1983 and through § 1343(3). *See* 532 F.2d at 559 & n. 8.

4. Because an alleged "taking" in violation of the fifth and fourteenth amendments presents a serious constitutional question, a direct cause of action lies within the district court's federal question jurisdiction. *See Gordon v. City of Warren,* 579 F.2d 386, 391 (6th Cir.1978); *Muskegon Theatres, Inc. v. City of Muskegon,* 507 F.2d 199, 200 (6th Cir.1974).

that consideration of *Monell* would be to act "far beyond the scope of the Court of Appeals' mandate." *Amen v. City of Dearborn,* No. 37242, slip op. at 6 (E.D.Mich. Dec. 26, 1979). In an unpublished order, this court denied plaintiffs' motion to amend the mandate for consideration of *Monell.*[5] *Amen v. City of Dearborn,* No. 74–1650 (6th Cir. March 21, 1980).

Thereafter, the district court began developing procedures to determine whether the individual class members could satisfy the amount in controversy requirement. During this process, however, Congress amended § 1331 to eliminate the jurisdictional amount requirement.[6] *See* Federal Question Jurisdictional Amendment Act of 1980, Pub.L. No. 96–486, 94 Stat. 2369 (codified as amended at 28 U.S.C. § 1331 (Supp. IV 1980)). Relying upon the explicit language of § 4 of the Act, which states that the Act shall apply immediately to any "pending" civil action, the district court held that it had jurisdiction under § 1331 notwithstanding the amount in controversy.

■ On appeal, the City contends that the district court violated this court's mandate and the law of the case doctrine in finding subject-matter jurisdiction under § 1331, as amended. Plaintiffs cross-appeal the district court's refusal to consider jurisdiction under § 1343(3). We find these claims to be without merit and hold that the district court properly found jurisdiction over the City under the amended version of § 1331.

The district court did not go beyond the terms of the mandate on remand. The mandate directed the district court to make findings of jurisdiction under § 1331. This is precisely what the district court did in analyzing and applying the amended version of § 1331.

The Federal Question Jurisdictional Amendment clearly applies to the instant case. The effective date of the Act was December 1, 1980. Section 4 of the Act provides that the Act "shall apply to any civil action pending on the date of enactment of this Act." It is evident that the issue of jurisdiction under § 1331 was "pending" on the effective date of the Act since it was under further consideration pursuant to this court's mandate. The courts have applied the Act retroactively and to actions pending appeal. *See, e.g., Barany v. Buller,* 670 F.2d 726, 732 & n. 12 (7th Cir.1982); *Eikenberry v. Callahan,* 653 F.2d 632, 635, 636 (D.C.Cir.1981); *Ellis v. Blum,* 643 F.2d 68, 85 (2d Cir.1981); *Theriault v. Brennan,* 641 F.2d 28, 29 n. 1 (1st Cir.1981).

Our decision is supported also by the legislative history of the Act. Congress stated unequivocally its intent "that this bill shall apply to any civil action pending in Federal court on the date of enactment. By putting congressional intent into immediate effect, *this provision will eliminate on-going jurisdictional battles, thus saving valuable court time.*" H.R.Rep. No. 96–1461, 96th Cong., 2d Sess. 4, *reprinted in* 1980 U.S.Code Cong. & Ad.News 5063, 5066 (emphasis added). In the instant case it is undisputed that the parties have been engaged in an on-going jurisdictional battle. This battle was resolved by the application of § 1331, as amended. To ignore the amended version of § 1331 not only would frustrate the intent of Congress, but would result in an unnecessary and unreasonable expenditure of time and money in this protracted litigation.

■ The City argues further that the district court violated the law of the case doctrine in applying § 1331, as amended. *See In re United States Steel Corp.,* 479 F.2d 489, 493–94 (6th Cir.), *cert. denied,* 414 U.S. 859, 94 S.Ct. 71, 38 L.Ed.2d 110 (1973), for a discussion of the law of the case doctrine. The short answer to this claim is

---

**5.** The order, in part, stated that "this Court is without jurisdiction to amend the mandate at this late date."

**6.** 28 U.S.C. § 1331, as amended, provides as follows:

The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.

that the law of the case doctrine does not foreclose reconsideration of subject-matter jurisdiction. *See, e.g., Green v. Department of Commerce,* 618 F.2d 836, 839 n. 9 (D.C. Cir.1980); *Potomac Passengers Assoc. v. Chesapeake & Ohio Ry. Co.,* 520 F.2d 91, 95 n. 22 (D.C.Cir.1975). Moreover, the doctrine is not so rigid as the rule of res judicata, *Southern Ry. Co. v. Clift,* 260 U.S. 316, 319, 43 S.Ct. 126, 126–27, 67 L.Ed. 283 (1922), and there is a well-recognized exception that the doctrine must yield to an intervening change of controlling law between the date of the first ruling and the retrial. *See EEOC v. International Longshoremen's Assoc.,* 623 F.2d 1054, 1058 (5th Cir.1980), *cert. denied,* 451 U.S. 917, 101 S.Ct. 1997, 68 L.Ed.2d 310 (1981); *In re United States Steel Corp., supra,* 479 F.2d at 494; 1B J. Moore, *Moore's Federal Practice* ¶ 0.404[10], at 575–76 (1982).

Accordingly, we hold that the district court acted properly in finding jurisdiction over the City under the amended version of § 1331.

Plaintiffs' sole contention in their cross-appeal is that the district court erred in refusing to apply *Monell, supra,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), on remand to establish jurisdiction over the City through 28 U.S.C. § 1343(3). Plaintiffs' claim for relief under § 1983 was dismissed by the district court in 1973 and this court affirmed the dismissal two years before the Supreme Court decided *Monell.* The merits of the cross-appeal are largely irrelevant in light of our holding that jurisdiction over the City exists under § 1331. Accordingly, we need not decide whether § 1343(3) would be an additional and proper jurisdictional bases for this action. *Cf. Moore v. Zarra,* 700 F.2d 329, 330 (6th Cir. 1983); *Pennsylvania v. Porter,* 659 F.2d 306, 314 (3d Cir.1981), *cert. denied,* 458 U.S. 1121, 102 S.Ct. 3509, 73 L.Ed.2d 1383 (1982).

## II.

The fifth amendment, made applicable to the states by the fourteenth amendment, provides that private property shall not be taken for public use without just compensation. U.S. Const. amend. V. The district court found that the City had engaged in a course of conduct which ultimately forced residents to sell their property to the City and that this conduct amounted to a taking without just compensation. *See* 363 F.Supp. at 1272–76. The court held further that several of the City's acquisitions were illegal because the City failed to state sufficiently a "public purpose" for its actions. *Id.* at 1279. Although we conclude that the City acted pursuant to a stated public purpose, we agree with the district court that the City engaged in an unconstitutional course of conduct which amounted to a taking of private property without just compensation.

### A.

Governmental action which places a burden on an individual's property which in fairness the entire community should share constitutes a taking and the government must compensate the property owner for the loss. *PruneYard Shopping Center v. Robins,* 447 U.S. 74, 83, 100 S.Ct. 2035, 2041, 64 L.Ed.2d 741 (1980). The government may violate the Taking Clause of the fifth amendment by denying an owner dominion over his property without invoking the formal power of eminent domain. *See United States v. Clarke,* 445 U.S. 253, 257, 100 S.Ct. 1127, 1130, 63 L.Ed.2d 373 (1980); *Kaiser Aetna v. United States,* 444 U.S. 164, 174 n. 8, 100 S.Ct. 383, 390 n. 8, 62 L.Ed.2d 332 (1979). Accordingly, the ultimate resolution of whether the government has unconstitutionally taken private property follows an ad hoc factual determination that the community, rather than the property owner, fairly should assume the cost of the official action. *Penn Central Transportation Co. v. New York City,* 438 U.S. 104, 123–24, 98 S.Ct. 2646, 2658–59, 57 L.Ed.2d 631 *reh'g denied,* 439 U.S. 883, 99 S.Ct. 226, 58 L.Ed.2d 198 (1978).

For fifth amendment purposes, the definition of property is broad, encompassing the entire group of rights incidental to ownership. *See PruneYard Shopping*

*Center, supra,* 447 U.S. at 82 n. 6, 100 S.Ct. at 2041 n. 6, *United States v. General Motors Corp.,* 323 U.S. 373, 377–78, 65 S.Ct. 357, 359–60, 89 L.Ed. 311 (1945). However, a taking does not occur merely because governmental action burdens or restricts some particular right or interest in a parcel of land. Rather, before a taking occurs the government must deny the owner all or an essential use of his property. *PruneYard Shopping Center, supra,* 447 U.S. at 82, 84, 100 S.Ct. at 2041, 2042.

As indicated, the district court found that the City engaged in several activities designed to force residents in the southeast section of Dearborn to sell their property to the City. As identified by the district court, such activities included:

1. The City has used its power to issue building permits, repair permits and occupancy permits to encourage people to move out by denying permits, verbally discouraging repairs, or causing unreasonable delay in the issuance of permits. The City also occasionally required complete remodeling of a house when a permit for only one kind of remodeling or repair was requested. Some persons in the subject areas also signed forms stating that any repairs permitted by the City would not be taken into account in computing the value of their home should the City later acquire it.

2. Manarino, City Director of the Community Development Department, told people in the areas that the prices paid by the City for their properties would be going down or that there was a fixed maximum price for homes in the area.

3. The City has required persons in the South End to perform maintenance and install items not required by the building code, including the installation of mechanical garbage disposal units under an ordinance which does not compel mechanical disposals as the only method of garbage disposal.

4. Many persons have solicited the court during the pendency of the temporary injunction asking that they be permitted to sell because, among other reasons, they fear that they cannot comply with the Dearborn building code. This indicates the effect of activities of the City in denying permits or requiring excessive repairs.

5. A city attorney, acting as attorney for an estate that owned property in the Eugene-Porath area, told the family that the City would purchase that property. He also told the family that it would be difficult to get an occupancy permit for the home because the City wanted to clear the area and consequently the inspectors would be very hard on the property in question.

6. The City has held many meetings in the South End with residents and has told them repeatedly that the South End will be cleared, north of Lapeer or north of Lowery.

7. The City has made press releases stating that Eugene-Porath and parts of the South End will be cleared.

8. The City has posted various signs throughout these areas which encourage people to sell to the City. On occasion the City has posted large signs which said, "Whoever wishes to sell to the City of Dearborn, call City Attorney," followed by a telephone number. The City has posted signs, "Sold to City of Dearborn" on property acquired by the City in these areas.

9. The City has allowed property it has acquired to remain vacant and unprotected, to induce neighbors to sell. On some of these properties the City posted signs which stated, "Free at your risk, take any part of the house. First come, first served. Hurry." These signs precipitated stripping of the houses to the consternation of the neighborhood.

363 F.Supp. at 1272–73.

■ These findings are supported adequately by the record, and, therefore, are not clearly erroneous. Fed.R.Civ.P. 52(a). We reject the City's claim that this court is not bound by the clearly erroneous standard and may engage in an independent examination of the record. *See, e.g., Urbanizado-*

ra Versalles, Inc. v. Rios, 701 F.2d 993, 996 (1st Cir.1983) (finding that freezing of plaintiff's land for unreasonable period of time amounted to an unconstitutional taking not erroneous); National Western Life Insurance Co. v. Commodore Cove Improvement District, 678 F.2d 24, 28 (5th Cir.1982) (finding not clearly erroneous that regulation did not diminish property value and amount to a taking); Harris v. United States, 467 F.2d 801, 803 (8th Cir.1972) (finding not clearly erroneous that governmental action did not amount to an unconstitutional taking).

The district court held that although none of the City's activities alone may have constituted a taking of private property, the combination of the City's actions resulted in a taking for which just compensation is due. See 363 F.Supp. at 1277–78. On appeal, the City takes the position that the district court erred in finding a fifth amendment violation, as a fifth amendment taking cannot occur in the absence of condemnation proceedings or a physical intrusion and that the mere diminution in property value due to the City's conduct is insufficient to sustain a taking in violation of the fifth and fourteenth amendments. We conclude that the City's position on this issue is without merit.

While the mere decline in property values does not, per se, constitute a taking requiring compensation, Danforth v. United States, 308 U.S. 271, 285, 60 S.Ct. 231, 236, 84 L.Ed. 240 (1939), governmental action short of acquisition may constitute a constructive taking "if its effects are so complete as to deprive the owner of all or most of his interest in the subject matter." General Motors Corp., supra, 323 U.S. at 378, 65 S.Ct. at 359–60. A case similar to the instant action is Richmond Elks Hall Assoc. v. Richmond Redevelopment Agency, 561 F.2d 1327 (9th Cir.1977). In that case, plaintiff's property was located within an area designated by the City of Richmond as blighted and scheduled for redevelopment. The redevelopment project was given widescale publicity and a purchase schedule for properties was established. For a number of years the City pursued its redevelopment plans and acquired several properties. As a result, property owners in the redevelopment area were unable to secure insurance and loans for improvement and upkeep. Additionally, due to the impending redevelopment, plaintiff suffered a substantial decline in rental income. Accordingly, when the City failed to purchase the Elks Association's property, plaintiff filed suit alleging a taking under the fifth and fourteenth amendments. The Ninth Circuit found that a compensable taking of plaintiff's property had occurred because the City's actions had rendered the property unsaleable and its intended use "severely limited". The court held that "[w]hen a public entity acting in furtherance of a public project directly and substantially interferes with property rights and thereby significantly impairs the value of the property, the result is a taking in the constitutional sense and compensation must be paid." 561 F.2d at 1330. See also Drakes Bay Land Co. v. United States, 424 F.2d 574, 584 (Ct.Cl.1970).

The court in Richmond Elks Hall Assoc., supra, relied upon two decisions from this circuit, Foster v. City of Detroit, 254 F.Supp. 655 (E.D.Mich.1966), aff'd, 405 F.2d 138 (6th Cir.1968) and Madison Realty Co. v. City of Detroit, 315 F.Supp. 367 (E.D.Mich. 1970). In Foster, the City of Detroit announced condemnation proceedings against an area which included plaintiffs' property. Plaintiffs were instructed not to make improvements to their property because they would not be compensated for such by the City. After ten years, the City discontinued condemnation proceedings without acquiring plaintiffs' property. Consequently, plaintiffs' property was vandalized and not rentable due in part to the change in the neighborhood. After plaintiffs were forced to raze their buildings, the City reinstated condemnation proceedings and compensated plaintiffs for the value of their vacant lots. The court found that the actions of the City contributed substantially to and accelerated the decline of property values in the affected area. Accordingly, this court in Foster held that the actions of the City constituted an unconstitutional taking of property be-

fore the actual condemnation of the property occurred.

Likewise, in *Madison Realty Co., supra,* District Judge Damon J. Keith found an unconstitutional taking when the City failed to invoke its powers of eminent domain despite its continuous threats to institute condemnation proceedings. The court found that the actions of the City, which included denials of building permits, denial of property reassessment for tax purposes, continued publication of redevelopment plans and denial of some city services, caused a significant reduction in the value of plaintiffs' property. The court held that such conduct constituted a taking of property within the meaning of the fifth amendment.

■■■■ These decisions demonstrate clearly that activities other than actual condemnation and physical intrusion can offend the Taking Clause. In the instant action, the record supports substantially the district court's holding that the City engaged in an unconstitutional course of conduct which effectively forced residents to sell their homes to the City. We find the overall conduct of the City not dissimilar to the conduct admonished in *Foster, supra,* and *Madison Realty Co., supra.* It is undisputed that the City of Dearborn made clear its intent to purchase and redevelop property on the South-End and Eugene-Porath areas. Notwithstanding this intent, however, the City chose not to invoke its condemnation powers, but, rather, elected to engage in a deliberate course of conduct to force the sale of private property at reduced value.

In arguing that its conduct did not amount to an unconstitutional taking, the City relies upon *Woodland Market Realty Co. v. City of Cleveland,* 426 F.2d 955 (6th Cir.1970) and *Sayre v. City of Cleveland,* 493 F.2d 64 (6th Cir.), *cert. denied,* 419 U.S. 837, 95 S.Ct. 65, 42 L.Ed.2d 64 (1974). The City's reliance on these decisions is misplaced, because both cases are distinguishable from the present case.

In *Woodland Market Realty Co., supra,* the property at issue was included within the proposed redevelopment project area but was excluded prior to any official action. As a consequence, the land was never part of the project and remained outside the affected area. Likewise, in *Sayre, supra,* the properties under dispute were never designated for appropriation under the urban renewal plan. The key feature in both *Woodland Market Realty* and *Sayre* is that the property in those cases was located outside the areas slated for redevelopment.

In contrast, it is undisputed in the present case that the City included the entire Eugene-Porath area and a large portion of the South-End area in its clearance and redevelopment project plans. Plaintiffs either live in houses which have been designated for appropriation or have already sold their property to the City. In *Sayre,* the significance of the property's location is noted as follows:

> *Woodland Market* acknowledges the authority of the legislative body to draw its own lines around the property it wishes to condemn by eminent domain. And the crucial geographic boundary is not that around the general planning area or the project area, but around the property that the city has demonstrated that it intends to appropriate. Absent the abuse of eminent domain found in *Foster,* including some action by the city indicating that *the particular piece of property at issue* is to be appropriated, economic loss caused by urban renewal does not constitute a taking within the meaning of the fifth and fourteenth amendments.

493 F.2d at 69 (footnote omitted). Other decisions also emphasize this distinction. *See, e.g., Thomas W. Garland, Inc. v. City of St. Louis,* 596 F.2d 784, 788–89 (8th Cir.), *cert. denied,* 444 U.S. 899, 100 S.Ct. 208, 62 L.Ed.2d 135 (1979); *Richmond Elks Hall Assoc., supra,* 561 F.2d at 1331; *Clinton Street Greater Bethlehem Church v. City of Detroit,* 484 F.2d 185, 188 (6th Cir.1973). Because the City intended to appropriate plaintiffs' properties, or has already done so, we find *Woodland Market Realty Co., supra* and *Sayre, supra,* inapposite to the present case.

Accordingly, we hold that the City's deliberate course of conduct caused such substantial damage to plaintiffs' properties that the properties in effect were actually taken within the meaning of the fifth and fourteenth amendments for which just compensation is due.

### B.

It is undisputed that the City of Dearborn possesses statutory authority to purchase or condemn private property for any public use or purpose. *See* Mich.Comp. Laws Ann. § 117.4e(2) (1967) (Mich.Stat. Ann. § 5.2078 (Callaghan 1978)). The district court held, however, that a number of the City's urban renewal programs lacked a formal declaration of a public purpose, and, therefore, several properties were obtained illegally. *See* 363 F.Supp. at 1278–80. We find this conclusion unsupported by the record and, accordingly, hold that the City's acquisition of properties was pursuant to a sufficiently stated public purpose.

■ So long as a public entity has authority to purchase or condemn private property, the appropriate subject for inquiry is whether the taking was for a public purpose. *Berman v. Parker,* 348 U.S. 26, 33, 75 S.Ct. 98, 102, 99 L.Ed. 27 (1954). The standard of judicial review in determining whether the public entity purchased or condemned private property for a public purpose is extremely narrow. *Berman, supra,* 348 U.S. at 32, 75 S.Ct. at 102, *United States ex rel. TVA v. Two Tracts of Land, etc.,* 532 F.2d 1083, 1084 (6th Cir.), *cert. denied,* 429 U.S. 827, 97 S.Ct. 84, 50 L.Ed.2d 90 (1976). However, a taking will be nullified as not being for a public purpose when it is demonstrated that the public entity acted in an arbitrary manner or in bad faith. *See United States v. 416.81 Acres of Land, etc.,* 514 F.2d 627, 631–32 (7th Cir. 1975); *United States v. Agee,* 322 F.2d 139, 142 (6th Cir.1963).

■ In the present case the record indicates that the City Council adopted a Master Plan for redevelopment purposes in the early 1960s. This plan included a housing classification map categorizing plaintiffs' properties as "conservation" or "redevelopment" areas. Such classification was required under State law. *See* Mich.Comp. Laws Ann. § 125.36 (1976) (Mich.Stat.Ann. § 5.2996 (Callaghan 1982)). The Master Plan is comprehensive and reflects the City's long-range aspirations in the orderly development and improvement of Dearborn. To implement the urban renewal goals contained in the Master Plan, the City Council adopted a number of Capital Improvement Planning Programs (CIPP). Each CIPP focused on a particular clearance project which would be undertaken in a specifically designated area in Dearborn.

The district court examined each adopted CIPP to determine if a public purpose was stated adequately for each clearance project. If the CIPP indicated that a clearing plan was designed to clear "slum" areas, the district court found the public purpose requirement satisfied. If however, the CIPP did not include the specific reason for the clearing plan, the court found no stated public purpose and, consequently, declared illegal any acquisitions made pursuant to that plan. *See* 363 F.Supp. at 1278–79.

We conclude that the district court's standard of review was too restrictive in that it ignored the overall urban renewal goals articulated by the City. The Master Plan spelled out the City's desire to rehabilitate and redevelop particular areas in Dearborn classified as "slums" and "blighted". Under Michigan law, acquisition of private property for clearance and redevelopment is recognized as a permissible public purpose.

*See Sinas v. City of Lansing,* 382 Mich. 407, 412, 170 N.W.2d 23, 26 (1969); *In re Slum Clearance,* 331 Mich. 714, 720, 50 N.W.2d 340, 344 (1951). The clearance projects, as outlined in each CIPP, were adopted by the City as the sole means of implementing the goals set forth in the Master Plan. Further, it is important to note that each CIPP incorporated by reference the Master Plan and the City's concern over slum conditions and the need for redevelopment. The "Forward" to each CIPP provided, in part, as follows:

The Capital Improvement Planning Program is directly related to the Master Plan of the City. It establishes a long-range financing program for implementing elements of the Master Plan over a period of time. Act 285 of the Public Acts of Michigan of 1931, as amended, provides that the City Plan Commission shall prepare and adopt, from time to time modify, and have custody of a Master Plan of the City showing present and planned physical development. The purpose of the Plan is to provide for the improvement of the city, its future growth and development, and promote the health, safety and general welfare of its population. The City Plan Commission completed and approved in 1962 a Master Plan for the City of Dearborn.

The Plan was developed after a thorough study of trends in population and employment and estimates of the needs of commerce, industry, and the people with regard to land, transportation, housing, recreation, and community facilities.

This statement, coupled with the long-range goals announced in the City's Master Plan, demonstrates that the City acted pursuant to a valid and sufficiently declared public purpose. Accordingly, we hold that the City's acquisitions were pursuant to a public purpose, and, therefore, that portion of the district court's judgment ordering the City to divest itself of properties obtained illegally is reversed.

### C.

■ The district court found that the City did not offer "fair compensation" to property owners in the South End and Eugene-Porath areas, thereby depriving plaintiffs of private property without just compensation. 363 F.Supp. at 1275. We agree. In *Almota Farmers Elevator & Warehouse Co. v. United States,* 409 U.S. 470, 473–74, 93 S.Ct. 791, 794, 35 L.Ed.2d 1 (1973), the Supreme Court defined just compensation as follows:

" [J]ust compensation means the full monetary equivalent of the property taken. The owner is to be put in the same position monetarily as he would have occupied if his property had not been taken." *United States v. Reynolds,* 397 U.S. 14, 16 [90 S.Ct. 803, 805, 25 L.Ed.2d 12] [1970] (footnotes omitted). See also *United States v. Miller,* 317 U.S. 369, 373 [63 S.Ct. 276, 279, 87 L.Ed. 336] [1943]. To determine such monetary equivalence, the Court early established the concept of "market value": the owner is entitled to the fair market value of his property at the time of the taking. *New York v. Sage,* 239 U.S. 57, 61 [36 S.Ct. 25, 26, 60 L.Ed. 143] [1915]. See also *United States v. Reynolds, supra,* [397 U.S.] at 16 [90 S.Ct. at 805]; *United States v. Miller, supra,* [317 U.S.] at 374 [63 S.Ct. at 280]. And this value is normally to be ascertained from "what a willing buyer would pay in cash to a willing seller." [*Miller, supra,* 317 U.S. at 374, 63 S.Ct. at 280]. See *United States v. Virginia Electric & Power Co.,* 365 U.S. 624, 633 [81 S.Ct. 784, 790, 5 L.Ed.2d 838] [1961]. See also *United States v. 103.38 Acres of Land, More or Less, etc.,* 660 F.2d 208, 211 (6th Cir.1981).

On appeal, the City does not challenge the detailed findings made by the district court on this issue. Rather, the City claims that "those individuals that sold their property to the City did so through fair, arms length negotiations fully knowing the value of their property." We reject this claim as being completely unsupported by the record.

Prices paid or offered by the City were based upon factors which inherently produced an artificially low market value for property located in the South End and Eugene-Porath areas. One method of appraisal employed by the City was to pay owners a price based upon the estimated market value of comparable property in the immediate area. The unfairness inherent in this method is that the market value of the property in the immediate area already had experienced a substantial decline due to the City's clearance activities. Thus, the use of a value-depressed parcel resulted automatically in a lower appraisal value for the

property being solicited by the City. Additionally, the record reveals that property values were assessed according to such factors as low tax assessments, the original purchase price with no account taken for unrealized gain, or on lot size only without additional compensation for the structure on the lot.

From these facts it is difficult to ascertain how any home owner could have received the fair market value of his or her property at the time of the taking. Accordingly, the record supports the conclusion that the City unlawfully deprived plaintiffs of just compensation by failing to provide owners with the "full monetary equivalent of the property taken." *Reynolds, supra,* 397 U.S. at 16, 90 S.Ct. at 805.

### III.

■ The district court exercised pendent jurisdiction over plaintiffs' state-law claims and held that the City violated state law in conducting its clearance projects by failing to comply with two state statutes. *See* 363 F.Supp. at 1281–83. On appeal, the City challenges the exercise of pendent jurisdiction as well as the district court's disposition of the pendent state claims.

At the outset we reject as being without merit the City's claim that the exercise of pendent jurisdiction was improper. It is clear that plaintiffs raised a substantial federal claim and, therefore, the district court had power to hear pendent claims which "derive from a common nucleus of operative fact." *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). In the present action, the state and federal claims have their origin in the City's conduct and make-up the underlying controversy between the parties. Accordingly, in the interest of judicial economy, convenience and fairness to the litigants, we hold that it was not an abuse of the district court's discretion to exercise jurisdiction over plaintiffs' pendent state claims. *See Aldinger v.*

*Howard,* 427 U.S. 1, 14, 96 S.Ct. 2413, 2420, 49 L.Ed.2d 276 (1976); *Gibbs, supra,* 383 U.S. at 726, 86 S.Ct. at 1139.

### A.

■ As to the merits of the first pendent claim, the district court held that the City's failure to develop and implement a relocation program for persons displaced due to its clearance projects violated Michigan's Relocation Assistance for Displaced Persons Act, Mich.Comp.Laws Ann. §§ 213.321–213.332 (Supp.1983) (Mich.Stat. Ann. §§ 8.215(61)—8.215(72) (Callaghan 1977)). This Act requires a State agency[7] to provide financial assistance, advisory services and reimbursement of certain expenses to persons displaced due to a governmental program requiring the acquisition of real property. The Act became effective on July 25, 1972.

The record shows that plaintiffs filed their complaint on October 14, 1971 and on March 22, 1972, the district court entered an order enjoining the City from acquiring property located in the South End and Eugene-Porath neighborhoods of Dearborn unless such acquisitions receive prior court approval. *Amen v. City of Dearborn,* No. 37242 (E.D.Mich. Mar. 22, 1972) (temporary restraining order). Consequently, any action on the part of the City prior to July 25, 1972 occurred before the Act's effective date. Nonetheless, the district court held that the City failed to comply with the Act and that its noncompliance constituted a continuing violation with respect to properties acquired with court approval on or after July 25, 1972.

Neither the language nor history of the Displaced Persons Act appear to require its application to individuals displaced prior to the Act's effective date. Therefore, given the absence of any authority mandating the retroactive application of the Act, we conclude that the district court erred to the extent that its ruling was based on the City's failure to assist those persons dis-

---

**7.** The City of Dearborn is considered a "state agency" for purposes of this Act. *See* Mich. Comp.Laws Ann. § 213.321(d) (Supp.1983)

(Mich.Stat.Ann. § 8.215(61)(d) (Callaghan 1977)).

placed prior to the effective date of the Displaced Persons Act.

### B.

In addition, the district court held that the City violated the Rehabilitation of Blighted Areas Act, Mich.Comp.Laws Ann. §§ 125.71–125.84 (1976) (Mich.Stat.Ann. §§ 5.3501–5.3513(14) (Callaghan 1982)). This Act provides a city with additional statutory authority to adopt and implement plans for the rehabilitation of blighted areas. The Act requires further that should a city proceed with redevelopment under this statutory authority, then it is required to appoint a citizens' district council with whom the city shall consult with and advise regarding all aspects of the redevelopment plan.

As found by the district court, the record shows that in March 1969 the Dearborn City Council passed an ordinance to proceed under the Rehabilitation Act and for the appointment of a citizen's district council. However, although a citizens' district council was appointed, only one meeting of the council was held and, thereafter, the terms of the members expired and no new appointments were made. In light of these facts, the district court held and plaintiffs contend on appeal, that the City is now compelled to proceed under the terms of the Act should it choose to continue its clearance programs. *See* 363 F.Supp. at 1283.

Although we agree with the district court that it appears that the City embarked on its redevelopment plan under the authority granted by the Rehabilitation Act, we disagree with that portion of the judgment which compels the City to proceed under the terms of the Act should it decide to continue its redevelopment projects. Section 13 of the Rehabilitation Act provides that the "powers granted in this act shall be in addition to powers granted to municipalities." Mich.Comp.Laws Ann. § 125.83 (1976) (Mich.Stat.Ann. § 5.3513 (Callaghan 1982)). Thus, the explicit language of the Act enables the City to proceed with redevelopment plans and, if necessary, purchase property under other statutory grants of power. Accordingly, since it is undisputed that the City of Dearborn does have other statutory grants of power to purchase property for redevelopment purposes, it undoubtedly has the authority to proceed with its clearance plans without invoking the additional powers contained in the Rehabilitation Act. It is noted further that under § 12 of the Act the City may repeal or modify otherwise the March 1969 redevelopment ordinance, provided it complies with the appropriate legislative procedures and conducts future redevelopment and acquisitions pursuant to other applicable statutory authority. *See* Mich.Comp.Laws Ann. § 125.82 (1976) (Mich.Stat.Ann. § 5.3512 (Callaghan 1982)).

Accordingly, we hold that the district court erred in compelling the City to proceed under the Rehabilitation Act should it decide to continue its clearance projects. So long as the City satisfies legislative procedures in nullifying the prior redevelopment ordinance, it has the discretion to secure acquisitions pursuant to other applicable statutory powers.

### IV.

Upon complying with this court's mandate and concluding that it had subject-matter jurisdiction, the district court reinstated its prior judgment and relief. The relief granted contains four primary features: (1) injunctive relief enjoining practices designed to force residents to sell their property; (2) injunctive relief compelling the City to divest itself of property it acquired without a stated public purpose; (3) a mandate requiring the City to comply with state statutory procedures in future acquisitions; and (4) the opportunity for those individual class members who sold their property to the City to establish any monetary loss from the sale. 363 F.Supp. at 1283–84. Additionally, the court ordered that should the City decide to proceed with its clearance and redevelopment plans, the projects must be completed within a six-year period. *Id.* at 1284. On appeal, the City challenges the terms of relief and argues that the district court abused its dis-

802

cretion in formulating an appropriate remedy.

In light of our holdings concerning the public purpose requirement and pendent state claims, it is clear that those portions of the relief granted by the district court must be modified appropriately on remand.

On remand, the district court is authorized to hear additional evidence with respect to any monetary loss from sales to the City by any individual class member. It is ordered that the district court's injunction enjoining the City from engaging in practices designed to force residents to sell their property shall continue in effect, unless and until modified by the district court.

Accordingly, the judgment of the district court is affirmed in part and reversed in part and the case is remanded for proceedings consistent with this opinion. No costs are taxed. The parties will bear their own costs on this appeal.