RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0353p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

HRT ENTERPRISES,

        *Plaintiff-Appellee/Cross-Appellant*,

    *v.*

CITY OF DETROIT, MICHIGAN,

        *Defendant-Appellant/Cross-Appellee*.

> Nos. 23-1847/1855

─────────────────

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:12-cv-13710—David M. Lawson, District Judge.

Argued: October 21, 2025

Decided and Filed: December 22, 2025

Before: GRIFFIN, THAPAR, and MATHIS, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Mary Massaron, PLUNKETT COONEY, Bloomfield Hills, Michigan, for City of Detroit. Mark Granzotto, MARK GRANZOTTO, P.C., Berkley, Michigan, for HRT Enterprises. **ON BRIEF:** Mary Massaron, PLUNKETT COONEY, Bloomfield Hills, Michigan, for City of Detroit. Mark Granzotto, MARK GRANZOTTO, P.C., Berkley, Michigan, for HRT Enterprises.

    GRIFFIN, J., delivered the opinion of the court in which MATHIS, J., concurred. THAPAR, J. (pp. 18–21), delivered a separate dissenting opinion.

---

**OPINION**

---

GRIFFIN, Circuit Judge.

After losing in state court, HRT Enterprises sued the City of Detroit in federal court under a de facto takings theory. The district court held that the state court's prior determinations did not bar this suit and granted summary judgment in favor of HRT without deciding when the taking had occurred. The first jury determined the date of the taking and awarded HRT $4.25 million, but the district court granted the City's motion for a remittitur and reduced the award to $2 million. The City rejected the remittitur and elected for a new trial on damages. The second jury awarded HRT $1.97 million.

On appeal, the City argues that the case is not ripe because HRT's case rests on hypothetical facts, not an actual taking, and even if it is ripe, the state court's prior determinations bar this suit. The City also argues that the district court erred in finding as a matter of law that its actions constituted a de facto taking and that it faced unfair prejudice at trial because it had to concede that a taking occurred on a particular date even though it maintained that no taking had ever occurred. HRT cross-appeals, arguing that the district court's remittitur was an abuse of discretion because the evidence in the first trial supported that jury's award of damages. We affirm.

I.

A.

In 1984, HRT bought an 11.8-acre parcel of land on the east side of Detroit. The property is next to Detroit's Coleman A. Young International Airport, and the airport's runway "visibility zone" covers approximately 20 percent of the property. A "visibility zone" is a regulated area that ensures a surrounding land use does not pose risks to aircraft operations; here, it limited HRT's ability to build on its property. The Federal Aviation Authority prohibits tall structures within a runway's visibility zone absent a waiver. 14 C.F.R. § 77. The City must

acquire HRT's property to comply with FAA regulations without the waiver.  The City acquired other properties near the airport in a residential area called the "Mini-Take" area but not HRT's.  HRT's property included an industrial building.  The four-acre building sat empty after the last tenant vacated in late 2008.  Vandals run amok on the property, and much of the area rots.

B.

HRT argues that because of the City, HRT is no longer able to use, lease, or sell the property.  In 2002, HRT and its tenants collectively filed suit against the City in state court and asserted an inverse condemnation claim.  In 2005, a jury rejected the claim.  In 2007, the Michigan Court of Appeals affirmed that jury verdict, and the Michigan Supreme Court denied leave to appeal.  *HRT Enters. v. City of Detroit*, 745 N.W.2d 786 (Mich. 2008) (mem.).

Then, on October 20, 2008, HRT sued the City in federal court.  The district court found that, although HRT pleaded new facts sufficient to circumvent res judicata based on the prior state court suit, it had not sought just compensation through state procedures based on the new facts.  Therefore, HRT was not yet entitled to a federal forum because it had not exhausted its state-law remedies in state court.  *See Williamson Cnty. Reg'l Plan. Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 194–97 (1985) (requiring litigants to first exhaust state-law remedies before bringing takings claims in federal court).  Thus, the district court dismissed HRT's federal action without prejudice.

On July 6, 2009, HRT accordingly filed a second suit in state court, claiming inverse condemnation of its property.  The state trial court dismissed HRT's claims on res judicata grounds, finding the claims barred by the 2002 state court action.  *HRT Enters. v. City of Detroit*, 2012 WL 3055221, at *2 (Mich. Ct. App. July 26, 2012) (per curiam).  In 2012, the Michigan Court of Appeals affirmed.  *Id.* at 3.  HRT did not seek leave to appeal to the Michigan Supreme Court.

All told, HRT lost its 2002 state court suit after a jury rejected its inverse condemnation claim.  Its 2008 suit in federal court was dismissed without prejudice under *Williamson County*.  And it lost its 2009 state court suit on res judicata grounds.

C.

In August 2012, HRT filed this suit, alleging a de facto takings claim under 42 U.S.C. § 1983 against the City.  The City filed a hybrid motion to dismiss and motion for summary judgment arguing that HRT had not exhausted its state-law remedies under *Williamson County*, and that the case was barred by res judicata and collateral estoppel.  The district court found that several factual developments since 2005 distinguished this action from the prior litigation in state court:

1.  The last remaining tenant on the property went out of business in late 2008 and the property is now vacant;

2.  The property has been looted by vandals who used adjacent City owned land to gain access to the property.  Further, the City is not maintaining the land it owns in the area, and it is being used as a dumping ground;

3.  HRT has been unable to lease or sell the property. The City, however, says that it technically leases the property because it is paying rent to HRT;

4. In December of 2006, Delbert Brown (Brown), manager of the Airport, confirmed the City's plan to construct a replacement runway, which requires meeting FAA airport facility standards;

5. In March of 2008, former City Mayor Kwame Kilpatrick stated that the City would complete the acquisition of land near the Airport along French Road;

6.  In October of 2008, Brown, in a letter to the City Council's Public Health and Safety Standing Committee, stated that the Airport "will continue the land acquisition program to facilitate safety areas, clear zones and ultimately the replacement of the existing runway";

7.  In March of 2010, the City's Purchasing Division informed the public that it intended to acquire all of the property necessary for building a replacement runway;

8. In October of 2008, Brown recommended to City Council against the reopening of McNichols Road, which was approved to be closed for five years in 1987;

9.  The City has continued to purchase both residential and commercial properties within, and outside of, the Mini-Take Area since 2005;

10. In February of 2007, the City entered into a grant agreement for another airport project and accepted state and federal funds for land acquisition;

11. In January of 2008, the City submitted to the FAA a proposal for funding to completely close French Road, the road on which HRT's property is located, between Lynch and McNichols;

12. In 2008, the City requested $85 million in funding from the FAA to expand the airport;

13. In 2009, the City constructed a left turn lane off of French Road, which leads to HRT's vacant property; and

14. In July of 2011, HRT hired Gilbert's Trucking to construct an earthen berm on the property to prevent trespassing. The City arrested and prosecuted employees of Gilbert's Trucking for trespassing on City owned property. Thus, the City has held itself out to the public as owner of HRT's land.

So the district court denied the City's motion.

HRT then moved for partial summary judgment on the issue of liability. The district court found the following:

(1) the record "supports the City's contention that there are no current plans to fund a new runway at the airport, and that the current Capital Improvement Plan is limited to maintaining and upgrading the existing runways and physical plant and to reimbursing the City for the Mini-Take acquisitions";

(2) the record "establishes that the City's acquisitions in the Mini-Take Area is intended to bring the airport in compliance of FAA safety standards—in particular, the standard building restriction line";

(3) that "line extends approximately one-third into the property, and limits buildings within it to 35 feet high or less, depending on the distance from the airport runway";

(4) "there is no dispute that the runway visibility line extends into the southeast corner of the property, and that the existing building requires an FAA waiver";

(5) and "it was 'probably not' possible to get a permit to build a 40-foot high building on the property within this building restriction line."

Accordingly, the district court held that a taking had occurred and granted HRT's motion, but it did so without deciding when the taking occurred.

HRT moved to bifurcate the trial into two phases—one to determine the date of the taking, and the other to determine just compensation. The City opposed the motion to bifurcate, arguing that it would face prejudice and two trials would be complex. The district court granted the motion but eventually reversed course and tried the two issues together. The case proceeded to trial to determine the date of the taking and just compensation.

Trial began and HRT contended that the City committed a taking on January 1, 2009—the date its last tenant went out of business. The City argued that the date of the taking was August 13, 2015—the date the district court granted partial summary judgment in favor of HRT on the issue of liability. The jury found that the taking occurred on January 1, 2009, and awarded HRT $4.25 million in just compensation.

The City then moved for a remittitur, which the district court granted after finding that none of the proofs supported the $4.25 million award. But the City did not accept the remittitur of $2,008,000, so the district court ordered a new trial.

During the lead up to the second trial, the City moved to dismiss for lack of subject matter jurisdiction, asserting that HRT's claims were not ripe. The district court denied that motion. At the second trial, the district court instructed the jury that the taking occurred on January 1, 2009, the date found by the first jury. The second jury awarded HRT $1,976,820 in just compensation. The City appealed. HRT filed a cross-appeal.

## II.

We first review de novo the district court's determination of ripeness. *Ammex, Inc. v. Cox*, 351 F.3d 697, 706 (6th Cir. 2003).

## A.

Federal courts are limited to hearing actual cases and controversies. U.S. Const. art. III, § 2, cl. 1. The ripeness doctrine "prevent[s] the courts, through premature adjudication, from entangling themselves in abstract disagreements" over non-final claims. *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580 (1985) (quoting *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 148 (1967)). A claim is not final, or ripe, if it rests upon "contingent future events." *Id.* at 580–81 (quoting Charles Alan Wright, et al., *Federal Practice and Procedure* § 3532 (1984)). Takings claims are ripe when "the permissible uses of the property are known to a reasonable degree of certainty." *Palazzolo v. Rhode Island*, 533 U.S. 606, 620 (2001). Governments cannot burden property owners with "repetitive or unfair land-use procedures in

order to avoid a final decision." *Id.* at 621 (citing *Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 698 (1999)).

A federal court should not consider a takings claim "before the government has reached a 'final' decision" on the property. *Pakdel v. City & Cnty. of San Francisco*, 594 U.S. 474, 475 (2021) (per curiam) (quoting *Suitum v. Tahoe Reg'l Plan. Agency*, 520 U.S. 725, 737 (1997)). The finality requirement is "relatively modest." *Id.* at 478. Finality ensures that a plaintiff is not prematurely suing over a hypothetical harm. *Id.* So courts only need a "definitive position" from the government as to "how the regulations at issue apply to the particular land in question." *Id.* (citation modified).

B.

The City contends that this matter is not ripe because HRT cannot show a final decision from the City that amounted to a taking. According to the City, HRT's claims are based upon future and hypothetical events. HRT counters that its claim hinges on a series of concrete past events that, when taken together, show that the City deprived HRT of all its property's value. Our ripeness inquiry turns on whether HRT's claim rests on a sufficiently "final" set of facts. It does.

HRT's takings claim is ripe because the permissible uses of HRT's property are known to a reasonable degree of certainty, meaning its claim does not rest on purely hypothetical or future events. As the district court correctly found, all of the following occurred after 2005: (1) HRT lost all its tenants; (2) vandals looted the property; (3) the City did not maintain the area; (4) others used it is a dumping ground; (5) in December 2006, the manager of the Airport confirmed the City's plan to construct a replacement runway; (6) in March 2008, former City Mayor Kwame Kilpatrick stated that the City would complete the acquisition of land near the Airport; (7) in March 2010, the City's Purchasing Division informed the public that it intended to acquire all of the property necessary for building a replacement runway; (8) the City voted against reopening McNichols Road, which was originally approved to be closed for five years in 1987; and (9) the City continued to purchase residential and commercial properties both within,

and outside of, the Mini-Take Area since 2005.  These facts are not speculative.  Based on this record, the City has taken a definitive position:  it will not condemn the property.

We also find it unfair to employ the finality doctrine after years of protracted litigation, multiple rounds of summary judgment briefing, and two jury trials.  *See Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1012–13 (1992) (discussing finality as a prudential requirement, not a jurisdictional one).  And requiring even more facts to establish finality in this case would allow municipal abuse of the finality doctrine.  *See Lilly Invs. v. City of Rochester*, 674 F. App'x 523, 527 (6th Cir. 2017) ("[R]igid application of the finality requirement would allow states to avoid the strictures of the Takings Clause by simply refusing to act or by imposing unfair conditions on disfavored developments.").  The district court appropriately rejected the City's ninth-inning finality argument.

## III.

We review de novo a district court's application of res judicata.  *ABS Indus., Inc. ex rel. ABS Litig. Tr. v. Fifth Third Bank*, 333 F. App'x 994, 998 (6th Cir. 2009).  We also review de novo a district court's ruling on issue preclusion.  *Georgia-Pac. Consumer Prods. LP v. Four-U-Packaging, Inc.*, 701 F.3d 1093, 1097 (6th Cir. 2012).

### A.

The Full Faith and Credit Act "requires [a] federal court to 'give the same preclusive effect to a state-court judgment as another court of that State would give.'" *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 293 (2005) (quoting *Parsons Steel, Inc. v. First Ala. Bank*, 474 U.S. 518, 523 (1986)); 28 U.S.C. § 1738.  Under the doctrine of res judicata, also known as claim preclusion, "a final judgment on the merits bars further claims by parties or their privies based on the same cause of action." *Bragg v. Flint Bd. of Educ.*, 570 F.3d 775, 776 (6th Cir. 2009) (quoting *Montana v. United States*, 440 U.S. 147, 153 (1979)).  Michigan law precludes subsequent claims when (1) "the prior action was decided on the merits, (2) both actions involve the same parties or their privies, and (3) the matter in the second case was, or could have been, resolved in the first." *Adair v. Michigan*, 680 N.W.2d 386, 396 (Mich. 2004).  Claim preclusion will not apply, however, "if the facts change, or new facts develop." *Lab.*

*Council, Mich. Fraternal Ord. of Police v. City of Detroit*, 525 N.W.2d 509, 511 (Mich. 1994) (per curiam). Nor will it "apply where a subsequent claim, based on new material facts, contains allegations of ongoing unlawful conduct that could not have been litigated in the prior proceeding." *Stanislaw v. Thetford Twp.*, 2021 WL 3027195, at *3 (6th Cir. July 19, 2021).

Michigan courts apply issue preclusion, also known as collateral estoppel, when "(1) 'a question of fact essential to the judgment [was] actually litigated and determined by a valid and final judgment'; (2) 'the same parties [] had a full [and fair] opportunity to litigate the issue'; and (3) 'there [was] mutuality of estoppel.'" *Monat v. State Farm Ins. Co.*, 677 N.W.2d 843, 845–46 (Mich. 2004) (quoting *Storey v. Meijer, Inc.*, 429 N.W.2d 169, 171 n.3 (Mich. 1988)).

In this case, the City's claim preclusion and issue preclusion arguments turn on the doctrines' analogous elements: whether HRT's prior takings claim could have been resolved in the prior suits (claim preclusion) and whether it had a full and fair opportunity to litigate the same (issue preclusion).

### B.

The City argues that HRT's taking claim is barred by both res judicata (claim preclusion) and collateral estoppel (issue preclusion) based on the prior state-court suits. We disagree.

The 2002 state court suit cannot serve as a basis for claim or issue preclusion. There were substantial developments since 2002 that could not have been litigated in that proceeding. In fact, the district court noted fourteen of these new developments. Most notably, the district court found that HRT had three tenants in 2002 but by 2009, it had none. Considering all the developments between 2002 and 2012, this action and the 2002 suit are distinct, and there was no full and fair opportunity for HRT to litigate its instant takings theory in the 2002 state court proceeding.

The 2009 state court action presents a closer question. Recall that HRT had to exhaust its state-court remedies before it could commence a federal action. To this end, it filed its second state-court action on July 6, 2009. The state trial court dismissed HRT's action on res judicata grounds because it found that the 2002 state-court action involved a final judgment on the merits

based on the same cause of action and the same parties. The Michigan Court of Appeals affirmed because it concluded that no new facts had developed between 2005 and 2009. Right or wrong, we must respect that ruling's preclusive effect, assuming HRT asserts the same claim here. *See San Remo Hotel, L.P. v. City & Cnty. of San Francisco*, 545 U.S. 323, 347 (2005). But HRT brought a different claim to federal court, one that included new facts.

At the district court, the City argued that the state appellate court decision barred HRT's suit under the doctrine of res judicata. The district court rejected the City's argument on two grounds. First, the district court held that the 2009 state-court action was not decided on the merits, and thus it was not entitled to preclusive effect. That was error. Under Michigan law, a decision is "on the merits" for res judicata purposes when disposed of at summary judgment. *Roberts v. City of Troy*, 429 N.W.2d 206, 211 (Mich. Ct. App. 1988); Mich. Ct. R. 2.504(b)(3).

But the district court also found that the operative facts had changed between 2009 and 2012. The Michigan Court of Appeals did not consider developments during this period because the record before it ended as of July 6, 2009—when HRT filed its complaint in state court. HRT filed this action on August 21, 2012, which lengthened the window of time for new facts to develop that were relevant to its de facto takings theory. And even in its complaint, it pleaded that "[a]dditional relevant events occurred even during the pendency of HRT's appeal, but the Michigan Court of Appeals refused to allow HRT to supplement the record to reflect these new events."

So the claim preclusion and issue preclusion questions presented to the district court, and before us now, are whether any new material facts developed after July 6, 2009 that could distinguish the prior actions (and issues) from the present one.

The district court referenced several: (1) in March 2010, "the City's Purchasing Division informed the public that it intended to acquire all of the property necessary for building a replacement runway"; and (2) in July 2011, the City held itself out to the public as the owner of HRT's property when it arrested several individuals hired by HRT to build a berm on the property. Neither the state trial court nor the court of appeals considered these facts.

Sometimes, a few new facts are all it takes to present a fresh claim. *See, e.g.*, *In re Pardee*, 475 N.W.2d 870, 874 (Mich. Ct. App. 1991) (per curiam) ("[R]es judicata should not be a bar to 'fresh litigation' of issues that are appropriately the subject of periodic redetermination as is the case with termination proceedings where new facts and changed circumstances alter the status quo."). A contrary rule would unfairly prejudice plaintiffs pursuing de facto takings claims, which by their nature often progress slowly over time. That is to say, a municipality is not forever free from takings litigation about a piece of property simply because it had prevailed in a similar suit a decade prior.

Because the district court reviewed a different period of time and a distinct set of facts, it did not err when it found it was not bound by the state-court decision. The takings claim HRT brought before the district court was not, and could not have been, resolved in the previous state-court proceedings. The district court correctly rejected the City's preclusion arguments.

IV.

Next, the City challenges the partial grant of summary judgment in favor of HRT as to liability, which we review de novo. *Burley v. Gagacki*, 729 F.3d 610, 618 (6th Cir. 2013).

A.

Private property shall not "be taken for public use, without just compensation." U.S. Const. amend. V. A taking can occur when a municipality engages in "a deliberate course of conduct" designed to force the sale of private property at a reduced value. *Amen v. City of Dearborn*, 718 F.2d 789, 797 (6th Cir. 1983). A de facto takings theory requires an "ad hoc factual determination that the community, rather than the property owner, fairly should assume the cost of the official action." *Id.* at 794 (citing *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 123–24 (1978)). Governmental actions that merely burden a particular right do not cross the takings threshold; the government must "deny the owner all or an essential use of his property." *Id.* at 795.

In *Amen*, we found that the City of Dearborn engaged in a scheme designed to force residents to sell their properties to the city. *Id.* at 797–98. Dearborn's scheme included the

following:  (1) Dearborn denied and delayed permits and discouraged repairs; (2) a city official told residents that the prices paid by Dearborn for their properties would decrease; (3) Dearborn required individuals to perform maintenance and install items not required by the building code; (4) residents feared that they could not comply with the building code; (5) a city attorney told residents that Dearborn would purchase the property; (6) the city held many meetings with residents and repeatedly told them that the disputed area would be cleared; (7) the city made press releases stating that parts of the area would be cleared; (8) Dearborn officials posted various signs throughout these areas that encouraged people to sell; and (9) the city allowed property it had acquired to remain vacant and unprotected.  *Id.* at 795.

On appeal, Dearborn argued that a taking could not have occurred because there was no condemnation proceeding or physical intrusion, only the mere diminution in property value.  *Id.* at 796.  We rejected that argument and explained that "governmental action short of acquisition may constitute a constructive taking 'if its effects are so complete as to deprive the owner of all or most of his interest in the subject matter.'"  *Id.* (quoting *United States v. Gen. Motors Corp.*, 323 U.S. 373, 378 (1945)).  *Amen* recognized that de facto takings are actionable when a municipality regulates the value out of a property even though it stops short of exercising its eminent domain authority.  *Id.*

## B.

### 1.

HRT's case resembles *Amen*.  The City of Detroit engaged in a series of activities that diminished HRT's property value.  The City acquired properties in the Mini-Take area, closed access roads, and City officials announced plans to acquire property in the area.  The airport's runway visibility zone encroaches on HRT's property and limits the property's uses.  To comply with the FAA requirements without a waiver, the City must purchase HRT's property, but it refuses to do so.  On HRT's end, its loss of tenants and business illustrates that the City's actions had consequences.

The City's reliance on our earlier takings jurisprudence is misplaced.  It is true that not all government planning and regulation amounts to a taking.  *See Woodland Mkt. Realty Co. v. City*

*of Cleveland*, 426 F.2d 955, 959 (6th Cir. 1970) (rejecting a de facto takings claim where the urban renewal project "never included the plaintiff's property"); *Sayre v. City of Cleveland*, 493 F.2d 64, 69 (6th Cir. 1974) (rejecting a de facto takings claim without some evidence of "physical invasion"). But unlike in *Woodland Market* and *Sayre*, HRT's property fell within the slated redevelopment zone and was altered by the City's actions. The airport's runway vision zone encroaches on HRT's property and limits the property's uses. The district court correctly concluded that the City's activities amounted to a taking.

2.

The City next argues that the district court erred when it granted partial summary judgment in favor of HRT without deciding when the taking occurred. We acknowledge that, typically, "a property owner has a claim for a violation of the Takings Clause as soon as a government takes his property for public use without paying for it." *Knick v. Twp. of Scott*, 588 U.S. 180, 189 (2019). "When a taking occurs by *physical invasion*, . . . the usual rule is that the time of the invasion constitutes the act of taking." *United States v. Clarke*, 445 U.S. 253, 258 (1980) (emphasis added). But when a party asserts a de facto taking—that is, gradual conduct by a government that deprives the owner of all or most of its property interest—the exact moment of the taking may be less clear.

But that does not mean takings plaintiffs are without recourse. *See United States v. Dickinson*, 331 U.S. 745, 746–49 (1947) (discussing accrual principles where a parcel of land was flooded by a new dam and the government did not condemn the property). When assessing takings claims that arise under "diverse circumstances[,] procedural rigidities should be avoided" so that an "owner is not required to resort either to piecemeal or to premature litigation to ascertain the just compensation for what is really 'taken.'" *Id*. at 749. Given the unique factual contours here—that the takings theory relied on a factually dense ad hoc inquiry—it is no surprise that genuine disputes of material facts precluded summary judgment on when the taking occurred. The City cites no analogous authority demonstrating that the district court erred by holding a taking occurred but reserving the exact date for the jury. *See* Fed. R. Civ. P. 56(a). Under these circumstances, we find no error.

3.

The City also asserts that the district court erred by relying on unsworn testimony at summary judgment. At a hearing on HRT's motion for partial summary judgment regarding liability, the district court requested to hear from individuals "fully familiar with the airport expansion and its background." The court started by reviewing a map of the "Airport Layout Plan [from] 1995." Michael Borta, a former planning consultant for the airport, testified at the hearing. With respect to the FAA regulations and the map, Borta explained that as "you move toward the runway, for every seven feet you get closer to the runway, the allowable height [of a structure] would be ten feet less." Jason Watt, the general manager of the airport, told the district court during that hearing that it was "probably not" possible to get a permit to build a 40-foot-high building on the property within this building restriction line. The district court then relied on their testimony in its opinion.

Although it was error to rely on unsworn testimony at summary judgment, *Dole v. Elliott Travel & Tours, Inc.*, 942 F.2d 962, 968–69 (6th Cir. 1991), this error does not require reversal because it was harmless, *see* Fed. R. Civ. P. 61. The record reveals that the district court had questions about a series of complex maps and the effect that the FAA regulations had on the properties. The City does not meaningfully contest the accuracy of the statements, and most of the information merely described a map already in the record. Nor does the City show that the district court's reliance on the unsworn testimony made any meaningful difference at summary judgment. De facto takings theories generally require a series of government actions, leaving no one fact dispositive. *See Amen*, 718 F.2d at 795.

V.

We review a district court's decision to bifurcate triable issues for an abuse of discretion. *Craddock v. FedEx Corp. Servs., Inc.*, 102 F.4th 832, 839 (6th Cir. 2024).

A.

"For convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues." Fed. R. Civ. P. 42(b). And "[o]nly one of these

criteria need be met to justify bifurcation." *Saxion v. Titan-C-Mfg., Inc.*, 86 F.3d 553, 556 (6th Cir. 1996). "[M]any courts have upheld cases bifurcated between liability and damages because the evidence pertinent to the two issues is wholly unrelated, and as a logical matter, liability must be resolved before the question of damages." *In re Bendectin Litig.*, 857 F.2d 290, 309 (6th Cir. 1988). We review (1) whether the bifurcated issues were indeed separate, (2) whether the issues could be tried separately without prejudice, and (3) "whether the separate trial would be conducive to judicial economy." *Id.* at 320.

## B.

The City argues that the district court's determination of whether a taking occurred, while leaving the issue of when it occurred to the jury, prejudiced its right to a fair trial. We disagree.

The City received fair trials. The City's argument boils down to a rejection of an unfriendly summary judgment ruling. The City wanted to argue that no taking occurred. But as explained previously, the district court appropriately granted summary judgment in favor of HRT on the issue of liability and declined to decide when the taking occurred. This is because the record was sufficient to prove that a taking had occurred as a matter of law, even if material disputes persisted as to when it occurred. These genuine disputes about timing created a question of fact for a jury. Additionally, the City does not explain how leaving the question to the jury prejudiced it, other than asserting it was barred from discussing the earlier state-court litigation at trial. But that is irrelevant.

To the extent that the City asserts a bifurcation argument, the district court did not abuse its discretion because the issues were indeed separate. *Saxion*, 86 F.3d at 556.

## VI.

We review a grant of remittitur for an abuse of discretion. *Smith v. John Swafford Furniture Co.*, 614 F.2d 552, 553 (6th Cir. 1980).

## A.

When a jury awards damages, it "must stand unless it is (1) beyond the range supportable by proof; or (2) so excessive as to shock the conscience; or (3) the result of a mistake." *Gregory*

*v. Shelby Cnty.*, 220 F.3d 433, 443 (6th Cir. 2000). So long as the damages award finds support in the record, it "should not be disturbed by the court." *Farber v. Massillon Bd. of Educ.*, 917 F.2d 1391, 1396 (6th Cir. 1990). A trial court must review "all evidence in the light most favorable to the awardee." *Id.* at 1395.

B.

After conducting the first trial, the district court reduced HRT's award from $4.25 million to $2 million. In its cross-appeal, HRT contends that this was error and requests that we reinstate the original award. The question is whether the facts at trial supported the district court's decision to grant remittitur in the amount of $2 million. We conclude that they did.

During the first trial, the parties presented conflicting testimony about the value of HRT's property. HRT's owner, Karl Thomas, testified that the property was worth $5 million. Andrew Reed, a real estate appraiser, testified on behalf of HRT and valued the property at $3,008,000 as of January 1, 2009. HRT also offered a document prepared by Michael Borta's consulting company on behalf of the airport, which labeled HRT's property value with a "placeholder" figure of $6 million to acquire. But Borta disavowed that figure at trial: "There is no specific basis for those [placeholder] numbers." Finally, Peggy Young, the City's expert, appraised the property at $3 million in 2002, $3,190,000 in 2005, and $1.5 million in 2010.

In granting remittitur, the district court explained that the "opinion of Thomas should have been given no weight by the jury" because "his opinion was not sound." The court did not abuse its discretion in rejecting Thomas's testimony. Landowners may testify to the value of their property. *Lee Shops, Inc. v. Schatten-Cypress Co.*, 350 F.2d 12, 17 (6th Cir. 1965). At the same time, it is not purely lay testimony. *See* Fed. R. Evid. 702 advisory committee's note to proposed rule ("Thus within the scope of [Rule 702] are not only experts in the strictest sense of the word, e.g., physicians, physicists, and architects, but also the large group sometimes called 'skilled' witnesses, such as bankers or landowners testifying to land values."). So some foundation must be laid regarding how a landowner appraised his property. *See U.S. ex rel. Tenn. Valley Auth. v. Easement & Right of Way Over a Tract of Land in Madison Cnty.*, 405 F.2d 305, 307 (6th Cir. 1968) ("[O]pinion evidence usually may be admitted from those who are not

strictly experts, the test being whether it can be shown the witness knows the land and its surroundings and has an opinion as to value based upon more than mere conjecture."). Although Thomas testified at length about his background in aerospace and real estate, he did not explain how he arrived at his $5 million valuation. The district court did not err in rejecting Thomas's testimony.

The district court also did not err in finding Reed's estimate to be "inflated" and correctly rejected his $3,008,000 valuation because the "comparables" he used "consisted of land and buildings" that were "improved." And the district court properly disregarded the $6 million "placeholder" value from Micheal Borta because he later disavowed that figure.

The court therefore did not abuse its discretion when it rejected the two highest valuations and determined that the proofs did not support the $4.25 million judgment. Thus, a remittitur was in order because it was beyond the range supportable by the proofs. *Gregory*, 220 F.3d at 443.

Citing *Wallace v. FedEx Corp.*, 764 F.3d 571 (6th Cir. 2014), HRT argues that even if remittitur was proper, the district court was required to award the maximum figure that the proofs would bear. And according to HRT, that figure was Reed's $3,008,000 valuation. But *Wallace* does not require a district court to automatically award the next highest figure. *Wallace* merely explains how a district court begins with assessing a remittitur. 764 F.3d at 592. It does not speak to how a district court should (let alone must) arrive at a certain figure after determining a remittitur is required. The district court therefore did not abuse its discretion when it reasonably split the difference between the viable proofs.

## VII.

For these reasons, we affirm the judgment of the district court.

———————————

**DISSENT**

———————————

THAPAR, Circuit Judge, dissenting.   While the majority's result is very appealing, I believe that res judicata bars this suit.  Thus, I regretfully dissent.

I.

The saga of this litigation stretches back to 2002.  That's when HRT Enterprises (HRT) first sued the City of Detroit in Michigan state court.  HRT alleged that the City had engaged in a de facto taking of HRT's property located next to the Coleman A. Young International Airport. HRT's case proceeded to trial, and in 2005, a Michigan jury found that no taking had occurred. The Michigan Court of Appeals affirmed that judgment, and in March 2008, the Michigan Supreme Court denied leave to appeal.  A few months later, HRT brought a takings claim in federal court, alleging that new factual developments had occurred after the 2005 jury verdict. But under then-binding Supreme Court precedent, HRT was required to first present those new facts to a state court.  *See Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 194–97 (1985), *overruled by Knick v. Township of Scott*, 588 U.S. 180 (2019).  So the district court dismissed HRT's complaint without prejudice.

In July 2009, HRT returned to state court to litigate its new takings claim.  But the Michigan trial court dismissed HRT's complaint because the 2005 jury verdict precluded this new suit.  HRT appealed, and the Michigan Court of Appeals affirmed that finding of res judicata because "there were no new facts in evidence."  R. 9-2, Pg. ID 297.  HRT didn't seek leave to appeal to the Michigan Supreme Court.

Instead, HRT returned to federal court, again asserting the same takings theory.  The City promptly moved to dismiss, or alternatively for summary judgment, arguing that the 2009 state-court dismissal precluded HRT's new federal case.  The district court denied that motion, concluding that the state-court dismissal wasn't a decision on the merits.  The district court also disagreed with the Michigan Court of Appeals and asserted that new factual developments *had* occurred between the 2005 jury verdict and the 2009 dismissal, so res judicata didn't bar HRT's

new federal suit.  As a result, this litigation continued.  But it should've ended there because the district court misapplied res judicata principles.

## II.

We review de novo a district court's determination of res judicata.  *Outdoor One Commc'ns LLC v. Charter Township of Canton*, 155 F.4th 776, 781 (6th Cir. 2025).  Under 28 U.S.C. § 1738, a federal court is required "to give the same preclusive effect to a state-court judgment as another court of that State would give."  *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 293 (2005) (quotation omitted).  So we apply Michigan law to determine whether the state court's 2009 dismissal precludes HRT's federal suit.

Takings cases are no different from any other claims for purposes of res judicata.  In the old days of *Williamson County*, a plaintiff asserting a takings claim was required to first litigate in state court before filing a federal suit.  473 U.S. at 194.  But normal res judicata principles still applied to the state court's judgment.  *San Remo Hotel, L.P. v. City & County of San Francisco*, 545 U.S. 323, 347 (2005).  As a result, that judgment would preclude any later federal suit asserting the same takings claim.  *See id.*  Even though the Supreme Court subsequently overruled *Williamson County*'s exhaustion requirement, it didn't overrule *San Remo*.  *See Knick*, 588 U.S. at 204–06.  So state-law preclusion principles continue to apply to plaintiffs like HRT that were required to exhaust their claims in state court.  *Rose v. Oakland Cnty., Mich. Treasurer*, No. 21-2626, 2023 WL 2823972, at *5–6 (6th Cir. Apr. 7, 2023).

Under Michigan law, "[t]he doctrine of res judicata bars a subsequent action when (1) the first action was decided on the merits, (2) the matter contested in the second action was or could have been resolved in the first, and (3) both actions involve the same parties or their privies."  *Estes v. Titus*, 751 N.W.2d 493, 499 (Mich. 2008) (citation modified).  It applies to "all matters that with due diligence should have been raised in the earlier action."  *Id.*  Indeed, Michigan courts have "taken a broad approach to the doctrine of res judicata."  *Washington v. Sinai Hosp. of Greater Detroit*, 733 N.W.2d 755, 759 (Mich. 2007) (quotation omitted).  The 2009 dismissal of HRT's second state-court lawsuit plainly satisfies this test.

Start with the first element. The district court concluded that the Michigan state court's dismissal of HRT's 2009 complaint wasn't a decision on the merits. But that's wrong. Michigan law treats an involuntary dismissal as "an adjudication on the merits" unless the court specifies otherwise or the dismissal was for lack of jurisdiction or failure to join a party. *Id.* at 757 (quoting Mich. Ct. R. 2.504(B)(3)). Here, the Michigan trial court dismissed HRT's complaint based on res judicata and didn't "specify that its order was without prejudice." *Id.* at 760. So that's a decision on the merits.

With respect to the second element, the majority concludes that new facts developed between when HRT filed a complaint in Michigan state court in July 2009 and when it filed a complaint in federal court in 2012. Maj. Op. at 10–11. That may be true—but there's a catch. Throughout this federal litigation, HRT has consistently asserted that the taking occurred on January 1, 2009, and it never argued that a taking occurred later. In fact, HRT moved for summary judgment on that basis, arguing there was *no dispute* the taking occurred on that date. When the district court denied that motion, HRT repeated the same argument before the jury. The jury agreed and calculated damages using that date. So any developments that occurred between July 2009 and 2012 have no bearing on whether a taking occurred on January 1, 2009. A state court already decided that no taking occurred as of 2009, and that determination binds us.

Finally, the two actions involve identical parties. Thus, with all three elements of res judicata satisfied, this case should've ended over a decade ago when the City moved to dismiss in 2012.

Perhaps for this reason, HRT conceded at oral argument that it would lose if we were to apply the elements of res judicata under Michigan law. *See* Oral Arg. at 30:30–30:41. So HRT instead argued that we should apply an equitable exception to res judicata. It's true that Michigan courts have sometimes suggested they won't enforce res judicata if doing so would "offend public policy or result in manifest injustice." *Storey v. Meijer, Inc.*, 429 N.W.2d 169, 173 n.9 (Mich. 1988) (quotation omitted). HRT contends that because it was forced to litigate in state court under *Williamson County* and the Supreme Court subsequently overturned that exhaustion requirement in *Knick*, it "would be manifestly unjust" to now bar HRT's federal suit. Appellee's Br. at 50.

I'm sympathetic to HRT's argument. As the Supreme Court acknowledged, *Williamson County* created a "Catch-22" for a takings plaintiff. *Knick*, 588 U.S. at 184. "He cannot go to federal court without going to state court first; but if he goes to state court and loses, his claim will be barred in federal court." *Id.* at 184–85. So *Williamson County* effectively closed the federal courthouse doors to a takings plaintiff asserting federal claims. In my view, that's manifestly unjust.

But unfortunately for HRT, Michigan law takes a strict view of res judicata. For starters, I haven't found a single Michigan state-court decision in the last fifteen years—nor has HRT identified one—applying the supposed public-policy exception to res judicata. In fact, just last year, the Michigan Court of Appeals cast doubt on whether the exception still exists under Michigan law. *See Neal v. Keefer*, No. 365676, 2024 WL 1229849, at *3 (Mich. Ct. App. Mar. 21, 2024).

But even if it does, this situation wouldn't qualify. That's because the Michigan Supreme Court has made clear "the interests of finality and res judicata limit the retroactive applicability of new legal decisions after a final judgment." *Schafer v. Kent County*, 515 Mich. 1, 27 (2024). So even if there is a change in law like *Knick*, "[t]raditional procedural standards such as . . . res judicata apply." *Id.* at 28. This accords with the approach taken by every other circuit to have considered whether *Knick* creates an exception to res judicata. *See Tejas Motel, L.L.C. v. City of Mesquite ex rel. Bd. of Adjustment*, 63 F.4th 323, 334–35 (5th Cir. 2023); *Stensrud v. Rochester Genesee Reg'l Transp. Auth.*, No. 23-765, 2024 WL 2104604, at *2–3 (2d Cir. May 10, 2024); *Bush v. Phila. Redevelopment Auth.*, No. 24-3070, 2025 WL 999080, at *1 n.1 (3d Cir. Apr. 3, 2025) (per curiam); *Ocean Palm Golf Club P'ship v. City of Flagler Beach*, 861 F. App'x 368, 371 (11th Cir. 2021) (per curiam). In short, the Supreme Court's intervening decision in *Knick* doesn't allow HRT to escape the res judicata effects of the 2009 state-court dismissal.

*          *          *

Because res judicata unfortunately bars HRT's suit, I respectfully dissent.